IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:26-CR-031 (MAD) |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **ROBERT SACCO**, | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
ROBERT SACCO'S MOTION FOR BAIL**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 1

    1.    Defendant Communicated with an Undercover Officer About Sexually Exploiting a 10-Year-Old Girl ................................................................................................................. 1

    2.    Arrest and Interview ....................................................................................... 7

    3.    Complaint and January 24 Detention Hearing in the Eastern District of New York .......... 8

    4.    Indictment and Initial Appearance in the Northern District of New York ...................... 10

ARGUMENT ................................................................................................................. 10

I.    THERE ARE NO CONDITIONS THAT WILL REASONABLY ASSURE THAT DEFENDANT WILL NOT FLEE OR POSE A DANGER TO THE COMMUNITY ................ 10

    A.   Legal Standard ................................................................................................. 10

    B.   Defendant Has Failed to Rebut the Presumption That No Conditions Will Reasonably Assure His Appearance in Court and the Safety of the Community ........................................ 11

CONCLUSION ................................................................................................................ 20

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in opposition to defendant's motion for bail pursuant to 18 U.S.C. § 3142(f).  *See* Dkt. 20.  For the reasons set forth below, defendant should remain detained because he is both a danger to the community and a risk of flight, and no combination of conditions can mitigate these risks.

## BACKGROUND

### 1.    Defendant Communicated with an Undercover Officer About Sexually Exploiting a 10-Year-Old Girl

Many of the following allegations are also detailed in the January 23, 2026 criminal complaint, which are incorporated by reference.  *See* Dkt. 1.[1]  In or about October 2025, defendant began chatting online with a Federal Bureau of Investigation ("FBI") undercover officer ("UC") posing as the father of a 10-year-old daughter with hearing and speech issues.  During those communications, defendant discussed masturbating while watching a live video stream of the UC sexually abusing his daughter.  Defendant also discussed his sexual interest two minor female relatives that he had access to, including a 5-year-old girl.  To obtain photos of the purported 10-year-old, defendant sent the UC multiple photos of his two minor relatives.  Defendant also discussed a future party with other children he would be attending and explained that he could get additional photos of minor children and send them to the UC.  In exchange, he proposed that the UC send naked photos of the 10-year-old with a bar obscuring the girl's identity.  Defendant also expressed an interest in traveling to the Albany area to masturbate from a distance while "admir[ing]" the child.  He also proposed showering with her "if she would be interested."

---

[1] Additional chats referenced herein were preserved by FBI, were produced to the defense (*see* USAO-0000031-245), and are available upon request for the Court's review.

On or about January 4, 2026, defendant requested naked photos of the UC's minor daughter "in a more erotic setting" and expressed his desire to "see her as you see her behind closed doors." Defendant also told the UC, "I would absolutely love to set something up in person, the proximity will make it tough but I'm willing to try and make it work if we can! And not offended at all, I totally get it. Maybe we can work up to video chatting together one day to start?" That same day, defendant asked the UC if the UC thought it would be good for the 10-year-old child to watch him masturbate and ejaculate on camera. The UC stated he would never ask for a video or picture of defendant's penis, but if he thought that would make the minor more comfortable, then he would be open to it. In response, defendant sent a photo of his erect penis and said he "would be honored to help her learn and grow." He also wanted to hear what the UC's daughter thought of his erect penis picture. Defendant wrote, "Had a thought too, do you think you like for her to watch me cum for her on cam? Maybe watch me stroke and explode all over myself for her?" He went on, "I can't wait to hear what she thinks of it ;) she would look to amazing with it resting on her beautiful face. . . "

From January 5 through January 7, defendant asked the UC whether he had shown the image of defendant's erect penis to his daughter and proposed that if she "likes what she sees" then they could arrange a video call. On January 7, defendant volunteered to purchase an outfit for the 10-year-old child to help her be more comfortable about engaging in sex acts. He perused the internet for ideas and sent the UC the following Amazon links to girls' underwear and bras:



To pay for these items, defendant sent the UC prepaid debit card information.

On January 8, defendant suggested that he and the UC video chat while masturbating so they could discuss the 10-year-old child. Defendant also asked the UC, "I don't think we discussed, anything that's off limits or things you don't want?" The UC responded, "I don't think theres any hard limits. Maybe just no marks where someone can see? Like no bruises or anything. Not really into scat stuff either but not opposed to much more. Maybe some water sport stuff if we wanna get really taboo. Only what youd be cool with seeing too." In response, defendant told the UC, "I agree on the marks. And the scat. I do love watersports. I think seeing that would definitely get me turned on." Defendant continued, "I'd love to see anything pee related. U peeing on her, her peeing on you or in general, in person I should love to have her pee in my mouth. Do you think she would be comfortable tasting it?" That same day, at defendant's request, the UC emailed

3

photos of his purported daughter to defendant so that he could masturbate to them and ejaculate on the photos. Defendant then sent back the photos with what appeared to be semen on them.

On January 8, defendant again discussed potentially coming "upstate" to meet the UC and his daughter. He proposed planning a "golf trip" and then would take a "little detour" to meet with the child. Defendant also asked if the UC ever came down to New York City with his daughter and offered to cover the cost of a hotel.

On January 10, the UC informed defendant that his daughter has hearing and speech issues so "when she moans it's like really loud and long and sounds sorta fucked up" and asked if defendant "would be cool with it." Defendant said he had no problems and then asked the UC to "record it so I can hear it beforehand? So I know what it sounds like?" On January 15, the UC emailed defendant an approximately 14-second recording of another undercover officer pretending to be the UC's daughter. In that recording, the female undercover moaned and said, in substance, "feels so good daddy." Defendant responded, "Holy fuck.... I am rock hard after listening to that 💧 💧 . . . As soon as I woke up I listened to it. I really can't wait to see her make those sounds."

On January 12, another FBI undercover ("UC-2") had a video call on an encrypted application with defendant where the two of them masturbated on screen. UC-2 was using a prosthetic penis. During the call, defendant said, in substance, that UC-2's penis was much bigger but that his would fit in the UC's daughter's mouth perfect. He also said that he wanted the UC's daughter to urinate in a fancy glass and that he would drink her urine. After the video call, defendant messaged that it was "crazy hot" and then asked, "Do you think [your daughter] would like seeing my cock? . . . Can't wait to see her ;) lemme know what days are good for you."

After the video call, defendant told the UC that he got the "fist toy" inside of his anus and that the UC's daughter "would be able to get her whole arm in there." He again proposed a video

4

call with the minor: "Mmmm how soon would you like to have the video chat with her? I can't wait 😳" Defendant also asked, "Have u told her about our plan to video chat soon? :)" While discussing the video call, defendant expressed his concern that he would ejaculate too quickly while watching the UC sexually assault his daughter. When the UC suggested that defendant "think about baseball or something[,]" defendant proposed inserting a mini baseball bat into the child's vagina.

The chat involving the UC, his 10-year-old daughter, and defendant was scheduled for the week of January 26, but defendant informed the UC that he would be traveling to Florida on January 25 so the video chat was moved up to January 23. Around this time, the UC informed defendant that Amazon rejected the prepaid debit card that defendant sent him. Defendant provided an Amazon gift card so that the UC could purchase the underwear that he had chosen for the UC's minor daughter, along with a "tiny" butt plug so that the UC could introduce her to "ass play." The UC sent "beginner to advanced" butt plugs (see below image) to defendant to see if those are what he had in mind for the UC's daughter and defendant responded, "Oooo yes!! I like :) can work up to taking the bigger one some day."



During some of their chats, defendant said he was concerned about being caught, including stating, "Do you ever use a [virtual private network]² when chatting about such naughty things? Every worry about privacy? Once in a while I get nervous seeing videos about people getting caught."  As January 23 approached, defendant again expressed concern about getting arrested, stating, "Idk if it's just me but I have been seeing a lot of news articles about guys getting caught with inappropriate stuff on their phone and I've been like kinda worried 😅"  Defendant also discussed using encrypted applications and never saving anything to his phone to avoid detection.

On January 23, at approximately 10:00 a.m., UC-2 and defendant engaged in a video chat after defendant had further discussed what sexually explicit acts he wanted the UC to perform on his daughter during the chat.  Defendant did not show his face, but UC-2 was able to recognize the same voice and penis from the January 12 video chat.  Defendant was masturbating while discussing, *inter alia*, having the 10-year-old child perform oral sex on the UC.

UC-2 then attempted to get the purported child from a nearby bedroom, but the child refused to come out.  After the video chat, defendant continued to exchange messages with the UC.  During the chats, defendant asked, "Do you wanna postpone?  I'm OK with another day.  Just lemme know :)  I'll go about my day if you guys wanna wait."  After the UC agreed with postponing, defendant asked, "Any pics you wanna tease me with in the meantime: :)" followed by "If u can send here where it's safe I'd love to see it before I sign out :) Or maybe a short video? 🥺"

---

² A virtual private network, or "VPN[,]" is an encrypted method of accessing the internet that masks your IP address and makes your data and/or browsing activity private.

The UC responded that he had sent pictures of his daughter to defendant before and was getting nervous that maybe defendant was setting him up.  Defendant responded, "Dude no worries, no I get it. Maybe I can tribute again for you? Would u wanna do that now? We can video and u can watch me blow a quick load," "She can just watch off camera" "Or just u and me." When defendant said maybe he could "tribute[,]" he meant ejaculate on a photograph of the UC's daughter as he did earlier in their conversations.  When the UC told defendant, "[w]e don't have to do that now sorry for being paranoid," defendant responded, "I was hoping to cut, I'd be happy to cut for u real quick" and clarified "cum*."  Defendant stated, "I'm pretty ready to haha I can just blow a load quick."  Then defendant asked the UC, "U wanna send me another pic? Or use one of the ones I did already?"  The UC responded by sending defendant another age regressed picture purporting to depict the UC's daughter.  Defendant asked, "Shall I print it and cum on it." Defendant proceeded to videotape himself masturbating and ejaculating on the picture of the purported child and then sent that video to the UC.

2.    **Arrest and Interview**

On January 23, defendant was arrested at the Nassau County Police Department ("NCPD") headquarters in Mineola, New York.  While being transported to the FBI Long Island office for processing, defendant made a number of spontaneous statements, including, in substance, "My life is over"; "I can save you the trouble, the laptop is in the living room"; and "I am just try to wrap my head around what my life looks like right now."  While searching his residence, law enforcement found multiple electronic devices, including an Apple laptop computer.  As of April 16, 2026, FBI has not been able to access the laptop.

During his interview at FBI, defendant waived his *Miranda* rights and admitted, *inter alia*, to chatting, both through texts and on video, with an individual upstate who had a minor daughter.

When discussing being called into the police station that evening, defendant, who at that time was a NCPD internal affairs detective, stated that "had a feeling something was up" since his NCPD "chief" was calling him into work on a Friday night. When asked about his cellular phone that was seized incident to arrest, defendant claimed that after his chief called him to come to the station, an "update" needed to be done to so he "reset" it. When asked, "[s]o your chief called you and then you reset your phone?[,]" defendant nodded in the affirmative.[3]

**3.      Complaint and January 24 Detention Hearing in the Eastern District of New York**

On January 23, 2026, this Court signed a criminal complaint charging defendant with one count of sexual exploitation of a child, in violation of 18 U.S.C. §§ 2251(a) and (e). *See* Dkt. 1. The following day, defendant appeared in Brooklyn federal court for removal proceedings before the Honorable Marcia M. Henry, United States Magistrate for the Eastern District of New York. *See* Dkt. 20-2 (Det. Hrg.) at 1-2. Judge Henry informed defendant that the purpose of the hearing was to, *inter alia*, decide whether defendant would be released on bond with conditions or removed in custody to the Northern District of New York. *Id*. The government, relying on arguments made in their written submissions to the Court (*see* Dkt. 8 at 31-37), moved to detain defendant as a risk of flight and a danger to the community. *See* Det. Hrg. at. 10. In substance, the government argued that defendant's conduct leading up to his arrest and the length of the sentence he was facing demonstrated that he was a flight risk and danger to the community. *See id*. at 11. The government also noted defendant that defendant expressed a sexual interest in multiple child relatives that he had access to. *See id*. at 15-17, 20-21.

---

[3] The FBI conducted a forensic examination of defendant's Android phone seized incident to arrest and confirmed that the phone was wiped.

8

Defendant's prior retained counsel agreed with the Probation Office's assessment that conditions could be set that would reasonably assure defendant's return to court and ensure the safety of the community. *See id*. at 11-15, 18-22; *see also* Dkt. 10 (E.D.N.Y. PTSR). Counsel argued that defendant had no prior criminal history, no substance abuse history, was a lifelong resident of New York, had been employed by the NCPD, and had a supportive family, as demonstrated by approximately 18 people in court that morning supporting him. *See id*. at 12. Counsel proposed the following release conditions: a substantial bond secured by one or more family members and two pieces of property; house arrest with electronic monitoring; no use of any internet capable devices; restricting any minors from visiting defendant's home; and posting defendant's residence. *See id*. at 12-16, 18, 20-22.

Citing the "detailed text messages" between defendant and the UC where defendant spoke about "admiring . . . two minor children" that are related to him and that he had access to, the Court was concerned about controlling who had access to defendant and restricting his access to minors. *See id*. at 19-20.

After hearing arguments by the parties and an oral Pretrial Services report (*see id*. at 17-18), Judge Henry ordered defendant detained. *See id*. 22-24; Dkt. 8 at 38 (Commitment to Another District). After noting that the defense had, "in some ways[,]" rebutted the statutory presumption of detention considering defendant's family support, steady employment, and ties to the community, the Court, relying on the remaining statutory factors, was "extremely concerned about [defendant's] access to children." *See id*. at 23. The Court explained that this child exploitation case was different because defendant was sending pictures and chatting about known children. Judge Henry concluded that defendant's "proximity to children" supported detention, reasoning that the Court could not "run the risk that [defendant] gains access to children that he knows or

9

doesn't know even with all the additional Adam Walsh conditions. I think that the risk there is too great for those conditions to mitigate it." *See id*. at 23-24.

**4.     Indictment and Initial Appearance in the Northern District of New York**

On January 28, 2026, a grand jury in the Northern District of New York indicted defendant on one count of attempted sexual exploitation of a minor, in violation of 18 U.S.C. §§ 2251(a) & (e). *See* Dkt. 4. On February 3, 2026, defendant appeared before this Court and was advised of the maximum penalties he was facing, including a mandatory minimum prison term of 15 years, with a maximum of 30 years. *See* 2/03/26 Text Minute Entry. Regarding detention, this Court noted, "[t]he EDNY held a detention hearing on 1/24/2026 at which Defendant was detained by US Magistrate Judge Marcia Henry." *Id*.

**ARGUMENT**

**I.     THERE ARE NO CONDITIONS THAT WILL REASONABLY ASSURE THAT DEFENDANT WILL NOT FLEE OR POSE A DANGER TO THE COMMUNITY**

**A.     <u>Legal Standard</u>**

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense was a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (cleaned up). The Second Circuit has held that the possibility of a

10

severe sentence is an important factor in assessing flight risk. *See United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee.") (citing *United States v. Sabhnani*, 493 F.3d 63, 76 [2d Cir. 2007]).

**B.      Defendant Has Failed to Rebut the Presumption That No Conditions Will Reasonably Assure His Appearance in Court and the Safety of the Community**

Defendant has failed to rebut the presumption that he will not flee or pose a danger to the community if released. *See* 18 U.S.C. § 3142(e)(3)(E).   Even if the Court were to find that defendant has rebutted the presumption, for the foregoing reasons, the government has met its burden of establishing both that defendant is a danger to the community and a risk of flight.

**Defendant is a Danger to the Community**

As detailed above and in the criminal complaint, defendant, who at the time of the offense was a law enforcement officer, attempted to sexually exploit a purported 10-year-old girl. Defendant chatted for months with an undercover officer, who repeatedly stated that he was sexually abusing his daughter. Instead of reporting the repeated sexual abuse of a child, defendant encouraged the continued abuse of the child and eventually logged into a live video stream so that he could masturbate to the exploitation of this child. When the child refused to come out of the bedroom to be sexually assaulted by her father, defendant asked about postponing the live stream and requested that the UC send another picture or video of the child to "tease [him] with." The undercover sent defendant another age-regressed photo and defendant sent back a video of him masturbating and ejaculating on the picture of the purported child.

Defendant not only encouraged the ongoing sexual exploitation of the minor, he also financially supported the abuse by sending prepaid debit card and Amazon gift card information to the UC to purchase children's underwear for the child to wear during her abuse. Defendant also encouraged the UC to purchase a "tiny" butt plug to introduce the child to "ass play." He also discussed his desire to engage in sadomasochistic conduct with the child: wanting the child to urinate on him or for him to urinate on her and shoving a mini baseball bat into her vagina.

Moreover, the purported 10-year-old was not the only child defendant was sexually attracted to: he repeatedly talked about his sexual interest in two minor relatives, including a 5-year-old girl. Defendant sent multiple photos of these two minor children to the undercover. As Judge Henry noted, it was this conduct, and the proximity to these children, that made defendant's sexual exploitation different than an "impersonal exchange of images." Def. Exh. A at 23.

**Defendant Has Been Charged with a Crime of Violence and the Weight of the Evidence is Very Strong**

Since defendant's original detention hearing, he was indicted by a grand jury with one count of attempted sexual exploitation of a child, in violation of 18 U.S.C. §§ 2251(a) & (e). The charged crime constitutes a crime of violence under the Bail Reform Act, *see* 18 U.S.C. § 3156(a)(4)(C), and involves a minor victim. *See United States v. Reiner*, 468 F. Supp. 2d 393, 397 (E.D.N.Y. 2006) ("Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.") (cleaned up). Defendant faces a mandatory minimum sentence of 15 years, with a maximum of 30 years. His estimated advisory Guidelines range, without acceptance, is 235-293 months.

12

The evidence against defendant is very strong.  It includes the extensive chats with the UC, the child images exchanged between defendant and the UC (including the multiple images defendant sent of his minor relatives), the "tribute" image and video sent by defendant to the UC, and his post-arrest admissions to FBI.  *See*  Dkt. 20-21 (Def. Memo.) at 6.  Further, defendant exhibited a strong consciousness of guilty by admitting that after he got a call from his police chief, he suspected "something was up" and wiped his cell phone.  Notably, such conduct may constitute a separate criminal charge punishable by up to 20 years imprisonment.  *See* 18 U.S.C. § 1519 (Destruction, alteration, or falsification of records in Federal investigations); *United States v. Kernell*, 667 F.3d 746 (6th Cir. 2012) (upholding a § 1519 conviction where defendant deleted his browsing history after other individuals on a message board raised the possibility that the FBI may investigate the defendant for unauthorized access to another individual's email account).

**Defendant's History and Characteristics**

Defendant spends pages talking about his professional accomplishments, volunteer commitments, and "exemplary character[,]" focusing on his time as a member of law enforcement and coordinator of various hockey-related charities and time spent coaching youth hockey.  *See* Def. Memo. at 9-15.  However, it is this background, especially his lengthy career as a law enforcement officer, that makes defendant a danger to the community.  *Cf. United States v. Ruiz*, 2021 WL 1427804, at *4 (S.D. Tx. Apr. 15, 2021) (upholding the detention of a police officer who sexually assaulted two women while on duty, reasoning that "to commit these types of acts . . he had to disregard and overcome specific legal training in addition to the usual moral and legal constraints against such conduct. It can't be assumed that his future good behavior is in any way assured").  In particular, during the alleged conduct, defendant's attempts to avoid detection were

13

demonstrated by his discussion of using encrypted chats and a VPN.  Defendant also told the UC that he would not save anything to his phone to avoid being caught.  This conduct continued until the day he was arrested, with defendant admitting that he wiped his cell phone the day he was arrested.

The allegations here are similar to a New Jersey case where a veteran police officer was charged with distribution of child pornography and was arrested moments before he was going to watch the live molestation of a minor via the internet.  *See United States v. Schenberger*, 498 F. Supp. 2d 738 (D.N.J. 2007) .  In rejecting defendant's request to be released, the court found that the fact that  "defendant was willing to permit this abuse to take place is a window into his character . . . the fact that a trusted police officer engaged in [the distribution of child pornography] is especially egregious.  Defendant betrayed his oath of office and the trust placed in him by his family, employer and the community at large.  If defendant betrayed this trust, no assurance can be given that he would not also violate any condition of release this Court imposed, no matter how stringent." *Id*. at 744-45.  Thus, defendant's history and character militate in favor of his continued detention.

In attempting to demonstrate that he is not a danger to the community, defendant relies heavily on the four-page opinion report ("Report" or "the Report") prepared by psychiatrist Dr. Eric Goldsmith. *See* Def. Memo. at 7-9; Def. Exh. B.  However, Dr. Goldsmith did not conduct a Sex Offender Risk Assessment Report, nor has the defense proffered any evidence that Dr. Goldsmith is even qualified to do such an assessment.  Instead, the Report states, in conclusory fashion, that if defendant's access to the internet is monitored, he "would not pose a threat to the community."  Def. Ex. B at 3-4.  However, the Report completely ignores defendant's desire to travel to Albany to sexually assault a 10-year-old girl or have her and her father travel to New

14

York City and have defendant set them up in a hotel so the child can be abused.  Further, the Report fails to address defendant's sexual interest in two minor relatives whom he had access to, one of which was 5 years old.  For this reason alone, the Report should be given little weight.

Additionally, the Report claims that defendant has "victim empathy" and that he "is highly motivated to receive sex offender treatment for the purpose of extinguishing consensual sexual fetishism interests, reducing sex drive and strengthening his monogamous sexual interest."  Def. Ex. B at 3.  It further states that, "most importantly, there is no evidence that [defendant's] offending behavior was facilitated by problematic antisocial factors [or] an inappropriate sexual interest in children. . . His offending behavior was driven by a non-paraphilic sexual motivation."[4] *Id*. at 3.  First, it is difficult to comprehend what would be an "appropriate" sexual interest in children.   Regardless, it strains credulity to argue that defendant's demonstrated interest in masturbating to the live-streamed sexual abuse of a 10-year old girl, desire to travel to abuse that child, and his admitted sexual interest in his minor relatives was "driven by non-paraphilic sexual motivation." *Id*.

Defendant also reported that he was not aroused by non-consensual sexual activity.  *See id*. at 3.  But his actions in the case belie that claim:  defendant logged in on January 23 to view and masturbate to the sexual abuse of a 10-year-old girl which, by definition, is nonconsensual.  *See*, *e.g.*, N.Y. Penal Law §130.35(1)(d) ("A person is guilty of Rape in the First Degree when he . . . engages in oral sexual contact with another person . . . who is less than thirteen years old and the

---

[4] "Paraphilic disorders are a group of psychiatric conditions characterized by atypical and intense sexual fantasies, urges, or behaviors that cause significant distress or impairment in social, occupational, or other important areas of functioning. These disorders involve non-consenting individuals, non-human objects, or the suffering or humiliation of oneself or others."  *Yale Medicine*, at https://www.yalemedicine.org/clinical-keywords/paraphilic-disorders.

15

actor is eighteen years old or more").    Further, the Report claims that defendant "does not receive pleasure from inflicting pain on others or causing suffering."  Def. Exh. B at 2.  Again, this is directly contradicted by defendant's desire to engage in sadomasochistic conduct with the child, including urinating on her and inserting a mini baseball bat into her vagina.

The Report appears to refer to the months-long conversations about the sexual exploitation of a child as "taboo[,]" not criminal.  *Id*. at 2.  It also incorrectly states that defendant "does not place himself in situations where he is in close proximity to prepubescent or underage postpubescent children."  *Id*.  But defendant spends significant time promoting his proximity to children through coaching youth hockey and participating in children's charity events.  *See* Def. Memo. at 10-12; Def. Exh. C (youth hockey photo).[5]  Apparently relying on information provided by defendant's wife (*see* Def. Exh. B at 1), it also states that defendant has never acted inappropriately with children around his extended family.  *Id*. at 2.  Of course, there is no indication that defendant's family was aware that he was expressing his sexual interest in his minor relatives to a stranger online or trading pictures of his minor relatives with this stranger in exchange for sexually suggestive images of a 10-year-old girl.   Lastly, the Report concluded that defendant "shows good control over his impulses."  *Id*. at 3.  However, simply reading through defendant's conversations with the UC and his logging into a live stream of what he believed was going to be the sexual abuse of a child demonstrates that defendant cannot control his impulses when it comes to the sexual exploitation of children.

---

[5] The 2014 photo is of a "Bantam A" youth hockey team.  "Bantam" refers to children 13 to 14 years old.  *See USA Hockey 2025-26 Age Classifications*, at https://www.usahockey.com/programrecommendations.

**Defendant Poses a Risk of Flight**

Defendant also poses a serious risk of flight.  Here, the mandatory minimum sentence for the crimes charged creates a strong incentive for the defendant to flee.  *See Khusanov*, 731 F. App'x at 21 ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee.")   Further, it is hard to imagine a defendant more capable of avoiding law enforcement than a former member of law enforcement.  *See Schenberger*, 498 F. Supp. 2d at 745 (finding that a police officer charged with distributing child pornography posed a risk of flight "given his knowledge of police practices and procedures").

**Defendant's Proposed Release Conditions Would Not Reasonably Assure That He Would Not Flee or Pose a Danger to the Community**

The only new conditions that defendant is now proposing is the constant rotation of family members at his house and giving Probation remote access to 24-hour perimeter security cameras to ensure no minors enter his home.  *See* Def. Memo. at 2; Def. Exh. A at 12-15.  Initially, defendant has already demonstrated his ability to hide his crimes from his friends and family.  Regardless, it is unreasonable to believe that Probation could effectively monitor defendant's relatives to ensure that they comply with any and all conditions set by this Court, including only bringing password-protected electronic devices into his home.  *See United States v. Valerio*, 9 F. Supp. 3d 283, 292 (E.D.N.Y. 2014) ("by the click of a computer key or tap of a touchscreen on a mobile phone, defendant could cause the same type of extreme harm to children and the community that he is alleged to have committed in the instant offense").  Additionally, it is unreasonable to expect Probation to effectively monitor defendant's residence around the clock to ensure that a family member was with him at all times and that no minors would enter.  *See id.* at

292-96 (rejecting defendant's attempt at creating a "private jail" to prevent any access to minors or unapproved visitors using, *inter alia*, 24/7 private security guards at his residence because of the "expenses and diversion of government resources . . . to implement and ensure continuing compliance with these efforts").   Further, the monitoring of these conditions would fall upon Probation in the arresting district, not the Northern District of New York, and there is no indication that the arresting district would be willing shoulder the incredible burden the defense is asking be placed on them.  Lastly, defendant was not just interested in using the internet to sexually exploit a child, but discussed plans to travel to sexually abuse the child or bring the child closer to him and pay for a hotel so that he could have access to the child.   In sum, there is no condition or set of conditions that could reasonably assure defendant's return to court or the safety of the community.

**Defendant's Citations to Three Eastern District of New York District Court Decisions Are Readily Distinguishable**

Defendant cites three Eastern District of New York decisions where courts released defendants with "similar child pornography offenses."   *See* Def. Memo. at 15-17.  First, while the defendant in *United States v. Roy Naim* was initially released by the magistrate judge (*see* Def. Memo. at 16), the government successfully appealed the release Order to the district court and defendant was detained pending trial.  *See United States v. Roy Naim*, 1:13-cr-660 (E.D.N.Y.) at Dkts. 13 (Minute Entry for Appeal) & 14 (Order of Detention Pending Trial).   Second, the other two cases are readily distinguishable.  The defendant in *United States v. Deutsch* had been released from state custody ten months prior to being charged federally and had fully complied with the terms of his release.  *See* 2020 WL 3577398, at *1 (E.D.N.Y. July 1, 2020).   It also took six different bail applications over 20 months for the district court to finally release defendant.  *Id*.

18

The defendant in *United States v. Lee* was charged with distribution and possession counts of child pornography, offenses that carry a significantly lower potential minimum prison term to the instant offense. *See United States v. Lee*, 972 F. Supp. 2d 403, 404 (E.D.N.Y. 2013). Additionally, it does not appear that the government sought defendant's detention. *See United States v. Lee*, 1:12-cr-108 (E.D.N.Y.) at Dkt. 4 [Minute Entry] (releasing defendant on conditions at arraignment without any apparent detention motion from the government). Lastly, and maybe most importantly, none of these cases involved a veteran police officer sworn to uphold and protect the law.

While the facts and circumstances of each case require a separate inquiry as to whether conditions can be set to reasonable assure that a defendant will return to court and/or ensure the safety of the community, there are recent examples in this district of similarly situated defendants being detained. For example, as recently as last month, a district court upheld a magistrate judge's detention order of a defendant charged with a single count of possession of child pornography, which carries no mandatory minimum sentence. *See United States v. James Winston III*, 2026 WL 865779 (N.D.N.Y. Mar. 30, 2026) (rejecting a defendant's motion to revoke a magistrate's detention order where defendant, who had strong family ties and a steady history of employment, was charged with a single count of child pornography); *see also United States v. Max Fishkind*, 1:25-cr-415 (AMN) (DJS) at Dkt. 8 (Detention Order) (detaining a defendant charged with one count of sexual exploitation of a minor despite his lack of criminal history and strong family ties); *United States v. Scarlet Shadows*, 1:23-cr-124 (AMN) (DJS) at Dkt. 7 (detaining a defendant charged with attempted coercion and enticement of a minor despite a lack of criminal history and concerns about receiving appropriate treatment while in custody).

## CONCLUSION

For the foregoing reasons, defendant's bail motion should be denied without a hearing and

he should remain detained pending the resolution of this case.

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

JOHN A. SARCONE III
First Assistant United States Attorney

By:     /s/ *Allen J. Vickey*
        Allen J. Vickey
        Assistant United States Attorney
        Bar Roll No. 513696