# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------

UNITED STATES OF AMERICA

                          CASE # 1:26-CR-00031

      -against-

ROBERT SACCO,

                Defendant.

------------------------------------------------------------

### *TRANSCRIPT OF BAIL HEARING*

**B E F O R E:**　　　　　**HONORABLE DANIEL J. STEWART**
James T. Foley Courthouse
445 Broadway
Albany, New York  12207

**A P P E A R A N C E S:**

**OFFICE OF THE UNITED STATES ATTORNEY**
**NORTHERN DISTRICT OF NEW YORK**
For the Government
James T. Foley Courthouse
445 Broadway
Albany, New York  12207
BY: ALLEN J. VICKEY, ESQ.
    Assistant United States Attorney

**GOTTLIEB TOWNSEND**
For the Defendant
111 Broadway, Suite 701
New York, New York 10006
BY: ROBERT C. GOTTLIEB, ESQ.
    KAYLEE KREITENBERG, ESQ.

**D A T E:**　　　　　**May 5, 2026**

*P R O C E E D I N G S:*

COURTROOM DEPUTY:  The date is May 5th, 2026, at 2:34 p.m., in the matter of USA vs. Robert Sacco, Docket 26-CR-31.

May I have appearances for the record, please.

MR. VICKEY:  Good afternoon, Your Honor.  For the United States, AJ Vickey.

THE COURT:  All right.  Good afternoon, Mr. Vickey.

MR. GOTTLIEB:  Your Honor, good afternoon. Gottlieb Townsend by Robert Gottlieb, 111 Broadway, New York, New York, 10006.

THE COURT:  All right.  Good afternoon to you, Mr. Gottlieb.

MS. KREITENBERG:  And Kaylee Kreitenberg, also from Gottlieb Townsend.  Good afternoon.

THE COURT:  Good afternoon.

Mr. Sacco, good afternoon to you.

THE DEFENDANT:  Good afternoon, sir.

THE COURT:  All right.  So we're here today at the request of the defendant for what is, in essence, in my opinion a renewed detention hearing.  That's Docket Number 20.  The defendant did have a detention hearing before the Magistrate Judge that came before me at the initial arraignment, Marcia Henry.  That was on January 24th, 2026.

In connection with this matter, I have received and reviewed a voluminous amount of material.  I have received the government's opposition to this request.  I have received Dr. Goldsmith's report, revised report.  I've received a report by New Paradigm and numerous other submissions.

So, Mr. Gottlieb, I guess I will have you go first since the burden is on you to show, I guess, a material change in the circumstance.  So why don't you go ahead and do that.

MR. GOTTLIEB:  We would like to proceed and call Dr. Eric Goldsmith, who is present, Your Honor.

THE COURT:  Okay.  You can go ahead and do that.

MR. GOTTLIEB:  Great.  I call Dr. Eric Goldsmith, and I believe he was meeting me outside.

(Dr. Goldsmith enters.)

THE COURT:  Dr. Goldsmith, you can come on up and be sworn.

*E R I C    G O L D S M I T H,*

having been first duly sworn by the Courtroom Deputy, was examined and testified as follows:

THE COURT:  The witness seat is there (indicating).

And you can use the podium if you want.

MR. GOTTLIEB:  Thank you very much.

May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION OF ERIC GOLDSMITH, MD, BY MR. GOTTLIEB:

Q.   Dr. Goldsmith, can you please introduce yourself to the Court, your name, and your occupation.

A.   Eric Goldsmith, MD.  I am a psychiatrist and a forensic psychiatrist.

Q.   And what is a "psychiatrist," the field of psychiatry?

A.   It's the branch of medicine where we are trained to evaluate and assess people's mental conditions.

Q.   And what is a "forensic psychiatrist"?

A.   "Forensic psychiatrist" is the application of psychiatry to law where I'm asked to evaluate people's states of mind at the time of alleged crimes.

Q.   Dr. Goldsmith, were you asked to perform both an initial evaluation, as well as a final evaluation, of Robert Sacco?

A.   Yes.

MR. GOLDSMITH:  And, Your Honor, to expedite matters, may I have marked and received in evidence Defendant's A -- I believe that's where it would be now -- his CV, and have that marked as Defendant's A for purposes of the hearing?

THE COURT:  Okay.  Is that the final report or the preliminary --

MR. GOTTLIEB: This is his CV.

THE COURT: Oh, CV.

MR. GOTTLIEB: The CV.

THE COURT: All right. Mr. Vickey, any objections?

MR. VICKEY: No, Your Honor.

THE COURT: All right. That's admitted.

(Defendant's Exhibit A received.)

MR. GOTTLIEB: Thank you.

CONTINUING BY MR. GOTTLIEB:

Q. Dr. Goldsmith, please tell us, how long have you been a psychiatrist?

A. Since 1991.

Q. And how long approximately a forensic psychiatrist?

A. Since 1992.

Q. Can you provide His Honor with your educational background?

A. I graduated from the University of Pennsylvania in 1983. I then went on to medical school in Syracuse graduating in 1987. I then went on to do a year of training in internal medicine at Lenox Hill Hospital in New York City. Following that, I went on to do a residency training in psychiatry at Mount Sinai Medical Center, also in New York City, graduating in 1991. Following that, I went on to a post-graduate year or fellowship year in forensic psychiatry

(ERIC GOLDSMITH, MD - DIRECT - BY MR. GOTTLIEB)       6

graduating the program at NYU in 1992.

Q.    And are you licensed to practice medicine in the State of New York?

A.    Yes.

Q.    And do you have any other certifications and licenses in the field of medicine and psychiatry?

A.    I have no other licenses other than New York State, and I am board certified in psychiatry.

Q.    And what does it mean to be "board certified"?

A.    So following graduation from the residency training program and out in the field of practicing of psychiatry, you are eligible to sit for written examinations, a series of written examinations.  If you pass those series of written examinations, you then are invited to give an oral examination, so you are interviewing patients in front of experts in the field of psychiatry, and if you demonstrated skills that are identified as being of excellence in the field of psychiatry, you're then deemed board certified in psychiatry.  It means that you're recognized as having achieved a degree of excellence in the field.

Q.    Doctor, have you had any appointments to educational institutions?

A.    Yes.

Q.    What were they, please?

A.    I have been with NYU since graduating my fellowship.

First I was a clinical instructor, so I taught courses and supervised residents, and I was a former co-director of the Forensic Psychiatry Training Program, and now and for the last 25 years, I have been a Clinical Assistant Professor of Psychiatry at NYU.

Q.   Now, Doctor, can you detail your past employment, background, and experience?

A.   So following my graduation from the Fellowship Training Program in Forensic Psychiatry, I started my private practice, so treating patients and doing forensic evaluations, but it was quite part-time, and I took a full-time job at the forensic hospital on Wards Island.  It's the hospital that services state forensic patients, so people who have been charged with crimes, but found to be incompetent, they get sent to Kirby for restoration of competency.  Also individuals who have serious mental illness and who are found not responsible by reason of mental disease or defect in the State of New York would go to Kirby.  And so my job at Kirby was to evaluate and treat those patients, but also perform forensic evaluations on them for the courts.

After approximately two years, I then went on to be, first, the Acting Clinical Director and then the Clinical Director of the hospital, so that meant I moved from a position of treating patients on a unit to now supervising the care and treatment and forensic evaluations of all the

patients in the hospital.

I left that job in approximately 1999.  I then stayed on at Kirby in a part-time position while my private practice continued to grow.  I then left the hospital, worked briefly for the courts where I conducted court-appointed examinations, and then in approximately 2001, left all employment.  And I have been in a full-time private practice since that time.

Q.   And, Doctor, when you treat people, as you've indicated, while at Kirby and thereafter, who you're asked to review for being incompetent or not responsible by reason of mental disease, can you identify -- just briefly summarize the factors, the risks factors, that you're looking at?

A.   So you -- the methodology is reviewing medical records, conducting lengthy and repeated interviews of the person that's the defendant, as well as interviewing collateral sources, and you're looking to see what the risk factors that you could identify might be that could speak to issues of dangerousness.

Q.   And dangerousness to who or to what?

A.   Dangerousness to one's self or dangerousness to the community, and there are different assessments that get done, depending upon what the question is in front of me.  So, for example, if it's a question like this where it's a question about whether someone can be released on bail status, you're

looking at various factors about what drives a potential risk of self or others in the community and what could be put in place to manage those risk factors.

Q.    And as part of that aspect of your work, have you been asked and have you rendered opinions with regard to whether or not somebody can be treated successfully for any mental disease or defect?

A.    Yes, absolutely

Q.    And after Kirby -- and, by the way, the number of years you were at Kirby, how many years?

A.    Oh, I'd say approximately 1992 through 1999.

Q.    So now after Kirby, after 1999, did you then continue in private practice?

A.    Yes.

Q.    And when did you begin the private practice in the area of psychiatry and forensic psychiatry?

A.    1992.

Q.    And can you please tell us what has been your focus, your specialty, in the area of adult psychiatry and forensic evaluations?

A.    So I treat patients in my office, which is Midtown Manhattan, of various conditions, including post-traumatic conditions, substance abuse disorders, personality disorders, sex offenders, mood disorders, anxiety disorders, and then I am asked by either a defense attorney or a prosecutor, or

even a judge, to get involved in a case where I am asked to assess someone's state of mind, and it could be an issue of competency, could be an issue of state of mind at the time of an alleged crime.

Q.   And the term "forensic evaluation," just briefly, what is that?

A.   That's the assessment of the defendant's state of mind in answering a particular legal question about, for example, whether or not someone is competent or not competent to proceed with their trial.

Q.   Over the years, can you give us just some estimate of how many, approximately, forensic evaluations in the area of psychiatry you have performed?

A.   Thousands of exams.

Q.   And as part of your practice, can you tell us whether or not your focus is adult or juvenile.  Give us a sense of the population that is your focus.

A.   My focus is almost exclusively evaluating adults.

Q.   What does the term "presentations" mean in your field of psychiatry?

A.   So in my field of psychiatry, when we are involved in the professional organizations or our university appointments, we're asked to give talks on areas of our expertise, and so over the course of my career through either the American Academy of Psychiatry and the Law, American

Psychiatric Association, for my position at NYU, I have given presentations on various topics in forensic psychiatry.

Q.   And over the years have you had occasion to teach -- you've already told us about being a director of a clinical program, but in the area of teaching, what, if any, experience do you have?

A.   So since really graduating the fellowship training program, I have been teaching residents at NYU in forensics psychiatry, and for the past 20 plus years, every week I supervise a forensic psychiatry resident in conducting forensic exams through our fellowship training program.  I also provide lectures and give presentations, and I lead certain programs within the fellowship training program at NYU.

Q.   Have you taught or lectured on the insanity defense?

A.   Yes.

Q.   In your field, the term "malingering," what is that?

A.   "Malingering" is the false presentation or exaggeration of psychiatric symptoms to effectuate some kind of secondary gain.  So, for example, in a case of this sort where someone is asking the Court to be released, a malingered issue would be to look to see whether or not they are faking well to make themselves appear more well and less

(ERIC GOLDSMITH, MD - DIRECT - BY MR. GOTTLIEB)    12

dangerous than they might be.

Q.    And over the years while you have been in practice and practicing psychiatry and forensic psychiatry, have you tested or evaluated somebody for malingering?

A.    Yes.

Q.    And approximately how many evaluations have you done focusing on the question of malingering?

A.    Every forensic evaluation that we do, malingering is an issue, and we're always evaluating for the malingering issue in all the forensic evaluations.  So the answer would be thousands of times throughout the course of my career.

Q.    Now, in addition to NYU, have you been on the faculty of any other schools?

A.    In addition to NYU, there was a period of time early in my career where I was on the faculty of Lenox Hill Hospital, a voluntary faculty member.

Q.    Have you been on the faulty of any law schools?

A.    Yes.

Q.    What law school?

A.    I am on the faculty of Cardoza Law School where I teach in the ITAP program.

Q.    What is the ITAP program.

A.    The ITAP program is the Intensive Trial Advocacy Program, and every year there is a -- the ITAP program occurs and there is an expert-witness day part of that program, and

I lead the teaching of that program.  I bring all of the fellows in forensic psychiatry throughout New York City into Cardoza Law School and we work with the other legal faculty and the students in conducting cross and direct examinations of expert witnesses.

Q.   And are you a member of any professional organizations?

A.   Yes.

Q.   Which professional organizations?

A.   I'm a former member of the Association for the Treatment of Sex Abusers.  I'm a member of the American Psychiatric Association.  I'm a member of the American Academy of Psychiatry and the Law.

Q.   Now, previously have you been qualified as an expert in forensic psychiatry?

A.   Yes.

Q.   Approximately how many times?

A.   Oh, hundreds and hundreds of times.

Q.   And have you testified in court as an expert in forensic psychiatry?

A.   Yes.

Q.   And in what courts?

A.   Courts -- state courts throughout New York State, state courts in Connecticut, federal courts all throughout New York.

Q.    And approximately how many times have you been qualified as an expert in forensic psychiatry?

A.    Thousands of times.

Q.    Now, Doctor, can you give His Honor some idea of who have you performed evaluations for; who has retained or requested that you perform a forensic evaluation?

A.    So I would say that about 40 percent of the time a prosecutor's office calls me and asks me to evaluate someone who is put forwarding a psychiatric defense, and about 60 percent of the time I am asked by a defense attorney to evaluate their client to see whether or not there is an issue of competency or potential psychiatric defense.

Q.    Can you give His Honor some idea of the jurisdiction of the prosecutors who have asked that you perform evaluations on behalf of the state or the government in Federal Court?

A.    I have done work for the Bronx District Attorney's Office, Westchester District Attorney's Office, Hudson District Attorney's Office, Staten Island, which is Richmond County District Attorney's Office.  I have done work for both the Eastern and Southern District across the US Attorney's Office.

Q.    On the defense side, what, if any, jurisdictions have you been retained to perform a forensic evaluation?

A.    All of the jurisdictions that I just named for the

prosecutor, as well as Manhattan, Queens County, Westchester County, Kings County, Ulster County, as well as other Federal Courts throughout New York State.

Q.   Okay, Dr. Goldsmith, with regard to judges, have you been asked on behalf of any members of the judiciary to undertake a forensic evaluation in any particular matter?

A.   Yes.

Q.   Can you just tell us which one and who is the judge?

A.   I had been asked in Federal Court by Judge Sand, who was presiding over a multi-defendant terrorism case, where one of the defendants in the middle of trial had claimed an acute amnestic event, and it was a question of competency. And so the judge asked me to evaluate whether or not that defendant was competent to proceed with the trial.  I have been asked by judges across New York State to do evaluations of people with respect to guardianship matters.  I am also a member of what's called "The Expert Panel in New York State" where there may be a civil retention matter or a treatment-over-objection matter where the judge would like to have an independent evaluation.  And so I am asked to do those evaluations.

Q.   And now, Dr. Goldsmith, have you previously evaluated individuals charged with sex-offending behavior, risk of dangerousness to the community, and appropriate sex

offender treatment?

A.   Yes.

Q.   And approximately how many times covering those areas?

A.   Oh, I would say at least 60 times.

Q.   And have you provided expert testimony in SORA hearings to set the risk assessment level for someone who has been convicted of a registerable offense?

A.   Yes.

Q.   Approximately how many times on that issue?

A.   I would say about ten times.

MR. GOTTLIEB:  Your Honor, at this time I respectfully request and ask that Dr. Goldsmith be qualified to provide his expert opinion on the underlying reasons for Mr. Sacco's sexual offenses, his danger to the community, and the risk of reoffending, and chances for success with appropriate psychiatric treatment.

THE COURT:  All right.

Mr. Vickey, any objection?

MR. VICKEY:  Just a brief voir dire, Your Honor.

THE COURT:  All right.  You may.  You may begin.

VOIR DIRE EXAMINATION OF ERIC GOLDSMITH, MD, BY MR. VICKEY:

Q.   Good afternoon, Doctor.

A.   Good afternoon.

Q.   When did you start practicing?

A.   1991, 1992.

Q.   So, doing the math, that's 35 years?

A.   Yes.

Q.   And so approximately how many sex offenders did you say you treated?

A.   Well, I have treated -- I would say I have treated and evaluated approximately 60 sex offenders or more over the course of my career.

Q.   Okay.  And then SORA, you said approximately 10?

A.   Probably that, yeah.

Q.   So that's about 70?

A.   I would say so.

Q.   So over the course of your career, you have done about two-a-year evaluations of sex offenders?

A.   I guess that's true, yeah.

Q.   Is it fair to say that your primary speciality is in capacity and ability to stand trial?

A.   I would say the majority of the work that I do, criminal matters, is state of mind at the time of a crime.

MR. VICKEY:  Okay.  No further questions, Your Honor.

THE COURT:  Okay.

MR. VICKEY:  Just with regard to -- just as an initial note, there's no Rules of Evidence.  This is a

(ERIC GOLDSMITH, MD - DIRECT - BY MR. GOTTLIEB)    18

detention hearing.

THE COURT:  Right.

MR. VICKEY:  So I don't know whether I can lodge an objection, other than the doctor has just said he's basically -- his primary specialty is in a different field of psychiatry than what we're talking about here, which is about risk assessment, about whether there are conditions that can reasonably be set to ensure risk of -- that the person will return or that he's a danger to the community.  So that's --

THE COURT:  No, I understand.

MR. VICKEY:  I think that's -- yeah, so I have no objection.  I mean, he can speak, you know.  I can proffer -- so I have no objection to you treating him as an expert.  I just point that out to the Court.

THE COURT:  Well, it's my hearing.  I understand the expert's qualifications, so why don't we get to the main issue.

CONTINUED DIRECT EXAMINATION OF

ERIC GOLDSMITH, MD, BY MR. GOTTLIEB:

Q.   Doctor, you evaluated and you were asked to evaluate Mr. Sacco?

A.   Yes.

Q.   Who requested that you conduct the evaluation?

A.   You did.

Q.   And have you been paid for your service?

A.    Yes.

Q.    Can you tell His Honor, please, the steps of the evaluation that you undertook of Mr. Sacco?

A.    I asked to see the complaint, I asked to see the printout of the chats that Mr. Sacco had with the undercover officer, and I went up to visit Mr. Sacco at the Delhi County Jail.  I conducted a personal interview with him in February of this year.  I then had a follow-up -- two follow-up interviews with him by video:  One in March; one in April.  And then I also had interviewed his wife Pilar Sacco.  I interviewed her by video in March and in April of this year.

Q.    And as far as the dates --

A.    I should just also add, today I was able to review a report by Probation, as well.

Q.    And the dates that you interviewed Mr. Sacco and Pilar Sacco, you had prepared a report; what dates -- having reviewed it again, what dates did you have those interviews?

A.    So I am just looking at my report as I answer that question (indicating).  So I interviewed Mr. Sacco on February 25th, 2026.  That was an in-person interview.  I did follow-up video interviews with him on March 6th, 2026, and April 13th, 2026.  I conducted video interviews with Pilar Sacco on March 9th, 2026, and April 7th 2026.

(ERIC GOLDSMITH, MD - DIRECT - BY MR. GOTTLIEB)      20

Q.   And the in-person interview with Robert Sacco was approximately how long?

A.   About two-and-a-half hours.

Q.   And the video interview with Robert Sacco was approximately how long?

A.   About two hours, two-and-a-half hours.

Q.   And the interview --

THE COURT:  Counsel, I have the report.  I've read it in detail.

MR. GOTTLIEB:  Thank you.

THE COURT:  Okay.  You may proceed.

CONTINUING BY MR. GOTTLIEB:

Q.   And you did prepare an initial report, which I believe Your Honor was included on our first -- on our motion and you prepared a final report, as well, correct?

A.   Correct.

MR. GOTTLIEB:  And, Your Honor, for the purposes again of the hearing, Your Honor has already indicated you have received the final report, I would ask for the purpose of the hearing that it be marked as Defendant's Exhibit B, that is the final report dated April 27th, 2026.

THE COURT:  All right.  That's fine.

MR. GOTTLIEB:  Thank you.

(Defendant's Exhibit B received.)

CONTINUING BY MR. GOTTLIEB:

Q.   In addition to the interviews, did you have occasion to read the chat messages, 223 messages?

A.   Yes, I did.   223 pages.

Q.   Okay.  Thank you.  Can you please summarize for His Honor the -- what you learned, what information, about Mr. Sacco's personal upbringing?

A.   So I learned that Mr. Sacco was raised in Brooklyn, New York, that his father is now a retired police officer. His mother was a nurse and, unfortunately, was diagnosed with breast cancer during the -- her pregnancy with Mr. Sacco's younger brother, that she passed away shortly after the birth of his younger brother, and he was raised then by some extended family members, one of whom began to live with Mr. Sacco and eventually re-partnered with his father.

He was subject to some significant early sexualization and abuse.  He had a relationship with a neighbor, who was four years older than him, who engaged him -- a male neighbor who engaged him in repeated acts of mutual masturbation, sexual play, anal and oral sex, and that those acts occurred over the course of his childhood from approximately age 10 through age 16.  He had an additional sexual contact as a teenager with another adolescent who was approximately a year older, and that took place over approximately one year; also sexual acts involving mutual masturbation, oral sexual contact.

He also had another sexual abuse incident where he was sexually abused by the mother of one of his hockey teammates, who he would have a sleepover at this roommate's house, and when this friend was asleep, his friend's mother brought him into her bedroom and engaged him in multiple sexual acts, including vaginal penetration.  It was his first sexual experience with a woman.  He was approximately 17 years old at the time.  And these incidents occurred over the course of several months during his adolescence.

These early sexualizations and sexual traumas clearly produced some hypersexualization of Mr. Sacco.  He developed a very high sex drive and interest in exploring multiple sexual behaviors, including what evolved into what he described as "kinky sexual behaviors."

Q.   Can you just explain, when you say "kinky sex behavior," what do you mean by that?

A.   So there are sexual behaviors which are considered part of non-deviant sexual experiences where individuals engage in consensual sexual acts that are beyond what we call normative sexual acts between a man and a woman.  And so for Mr. Sacco, he developed an interest in what's called "voyeuristic sexual behaviors," sexual behaviors involving various acts of humiliation, sexual acts involving bringing extra partners into his relationships, and he was highly driven.  This was highly stimulating to him.  He found

himself being active on a particular Internet site called FetLife, and it was an opportunity to engage with other people who were involved in these consensual kinky sexual acts or fetish sexual acts

Q.   Now, with regard to the victimization that you have informed the Court about, what, if any, impact does having that experience, being victimized, as you have described, what impact does that have on somebody's growth in sexual relations?

A.   It has a tremendous impact on their sexual development.  It really distorts their sexual development. Individuals who are young, who are engaged in high sexual acts, they don't have the emotional and psychological capacity to cope with it, and so while he may have had an experience as a youngster of being kind of exciting, it overwhelms them emotionally and drives the sex drive that becomes very dysregulated as he aged into adulthood.  And he would -- he demonstrates a lot of kind of sexual behaviors that we now identify as sexual addiction.  He finds himself -- as an adult, he was very unable to contain all of this interest in these kinky sexual acts, and he needed to go onto the websites, the chat sites, so he could talk to others about them.

Q.   During your evaluation and your interviews and review of documents, did you read or learn of any allegation

that Mr. Sacco ever met up in person with an underage child?

A.    I have never come across any information that supports that.

Q.    With everything that --

THE COURT:    Let me just ask, but there is information that he attempted to meet up with a child, correct?

THE WITNESS:    During the chats, certainly, with the undercover.

MR. GOTTLIEB:    Thank you.

CONTINUING BY MR. GOTTLIEB:

Q.    And taking His Honor's question and your answer, can you explain what that, as part of your evaluation, signified and represented that he then did in a chat, talk about an underage child; can you explain what, if any, significance that has in your reaching whatever opinion you're about to offer?

A.    So when I am evaluating someone's state of mind, what motivates them to engage in these transgressed sexual acts, these deviant sexual acts or deviant sexual conversations, you're looking to see, well, what are the motivations.  You know, there are many -- in forensic psychiatry, what we've come to learn is that there are many different motivations that drive people to engage in these

sexual chats and wanting to meet up with even an underage person.  And so for Mr. Sacco, what I came to understand is that he was driven to engage in these sex chats that would develop for him into anything taboo, something that would be outside of a normal -- what we call a normative sexual act, but something that could be that much more stimulating to him because of his interest in these kinky sexual behaviors.  So he was talking to different people about all kinds of different things in the fetish realm.

And in the conversations with the undercover, he is engaging in these conversations about all kinds of taboo sexual acts, listening to the undercover talk about a fictitious ten-year-old child, and how that became sexually arousing to him and how it was taboo, and the idea to continue to engage in the conversation, continue to push the envelope, it was part of his high sex drive and his motivation to kind of explore all of these taboo sexual acts.

THE COURT:  Can I just stop you for a second.  I apologize for interrupting.  But with regard to the fictitious child, is there any evidence that Mr. Sacco knew it was fictitious?  I mean, you're stating that because it was an undercover officer and everything, but --

THE WITNESS:  Yes.  It does not appear that Mr. Sacco, you know, believed that this was not a real child.

And certainly in my conversations with him, he is accepting of the fact that he pursued conversations and pursued acts to meet up with a true person.

THE COURT:  Thank you.

CONTINUING BY MR. GOTTLIEB:

Q.    Now, did you reach a diagnosis, a medical psychiatric diagnosis, to a reasonable degree of medical psychiatric certainty about Mr. Sacco and his conduct as charged in the indictment?

A.    Yes.

Q.    And can you please share with us what your diagnosis was.

A.    I found that Mr. Sacco evidences a post-traumatic condition.  The evidence is what's called a paraphilic condition, and that his behavior that lead to his arrest was driven by his high sex drive, his addictive sexual behavior as it relates to involvement in these taboo or kink sexual acts, and how it transgressed a boundary for him during this period of time, the situational period of time in his life leading to his arrest.

Q.    And, again, was there any indication as you continued your evaluation that Mr. Sacco had ever reached out and actually engaged with an underage child?

A.    I have no information that supports that he had any of the characteristics of someone who would reach out and try

to engage with an underage child.  He's not someone who put himself historically in situations where he was around children.  He did not evidence any inappropriate behaviors when he was around children.  From my conversations with his wife, who described to me the large family that he came from and the amount of contact he had with underage children, historically he did not engage in activities that would put him in proximity to children.  So these are all the characteristics that support the finding that he was not driven to kind of engage himself with children for the purposes of getting in close proximity and eventually having some sexual contact.

Q.   Now, the DSM is what?

A.   The diagnostic manual that psychiatrists follow when we use the criteria to diagnose individuals.

Q.   And the diagnosis that you provided to the Court, is that found in the DSM?

A.   Yes.

Q.   What are they called and what are the sections?

A.   It's two sections:  One is a section of trauma and stressor-related disorders; and the other is what's called a "paraphilic disorder."

Q.   What is "paraphilic disorder"?

A.   So "paraphilic disorder" is where someone engages in some sexual acts, whether it be in fantasy or actions

themselves, that result in some either arrest, level of distress, problematic social and psychological problems for them. And so for Mr. Sacco, his engagement in these taboo or kinky consensual sexual fantasies, it overcame his life to such a point where he engaged in these conversations with the undercover and got himself arrested.

MR. GOTTLIEB: And, Your Honor, I believe we have already turned it over to Your Honor previously, but if we could have, for the purposes of the hearing, Defendant's Exhibit C, which are the two sections of the DSM about which Dr. Goldsmith just testified.

THE COURT: Absolutely.

MR. GOTTLIEB: Thank you.

(Defendant's Exhibit C received.)

CONTINUING BY MR. GOTTLIEB:

Q. All right. Doctor, with regard to pedophilia, what is "pedophilia?"

A. So "pedophilia" is a -- it's a deviant sexual arousal to prepubescent children, so an individual evidences sexual arousal and even engages in contact with a child, particularly defined in the DSM as a "prepubescent child."

Q. And did you reach any conclusion to a reasonable degree of medical psychiatric certainty as to whether or not Mr. Sacco evidences any signs of pedophilia?

A. Yes.

Q.    What is that opinion?

A.    It's my opinion to a reasonable degree of psychiatric certainty that Mr. Sacco does not evidence characteristics of someone who's a pedophile.  He doesn't have -- there is no evidence of pedophilia.

Q.    All right.  Doctor, you wrote in your report on Page 8, which His Honor I know has read it, but you wrote, quote, "However, most importantly there is no evidence that Mr. Sacco's offending behavior was facilitated by problematic antisocial factors and inappropriate sexual interest in children, alcohol, or substance abuse.  His offending behavior was driven by a non-paraphilic sexual motivation." So can you explain to His Honor what antisocial factors were you referencing and why you reached that conclusion?

A.    The most important assessment that we do in these situations is looking to see what motivates the individual and what facilitates -- what motivates the defendant and what facilitates the defendant to engage in these sex offense crimes.  And so we always are looking to see whether or not the behavior was motivated by inappropriate sexual arousal with children, and whether or not there were antisocial factors that facilitated his actions.  These are the most important factors that we know from the literature that speak to issues about future dangerousness.  If someone -- particularly if someone is a sex offender and there is

evidence of antisocial characteristics, antisocial behaviors, then that is a high indicator of future dangerousness for the cohort of the sex offender.

So you look to see whether or not is Mr. Sacco someone who has a previous criminal history; is he someone who has a history or pattern of rule breaking; does he have a conduct disorder history as a child; does he have oppositional defiant behavior as a child and adolescent; has he behaved in ways that would be considered not living up to certain social norms.  So this a part of the assessment that I do for the lengthy interview of him, as well as his wife, to see if there is any evidence of these antisocial factors, and I find no evidence whatsoever that Mr. Sacco evidences antisocial behavior or any antisocial personality characteristics.

Q.   And with regard to the texts that you referenced earlier, can you please tell us what those texts and what was said by Mr. Sacco indicates as far as in connection with your diagnosis?

A.   Texts?

Q.   The text messages.

A.   The text messages.

Q.   Yes.  What relevance does that have or what does -- what role does that play in you reaching the opinions that you've already given His Honor?

(ERIC GOLDSMITH, MD - DIRECT - BY MR. GOTTLIEB)    31

A.    So the review of the text messages is the evidence of his actions that, of course, led to his arrest.  And so you look at the text messages and, you know, see whether or not there is, you know, evidence of admissions of prior sexual acts with children; is there any evidence that he is acting in some devious or antisocial way as it relates to being sadistic with a child victim.  And I saw no evidence whatsoever of that in these text messages.

Q.    In your opinion, to a reasonable degree of medical psychiatric certainty, did you observe or see any signs of malingering?

A.    No, there was no signs of malingering.

Q.    Now, based on your experience and your training about what you have already testified, do you have an opinion as to whether or not Mr. Sacco's issues and the diagnosis is treatable?

A.    Yes.

Q.    And what is your opinion?

A.    It's my opinion, to a reasonable degree of psychiatric certainty, that Mr. Sacco evidences the type of paraphilic condition, a post-traumatic disorder condition, which is highly treatable.

Q.    What type of treatment would you recommend, in your opinion, would maximize the chances of a successful treatment?

A.   So Mr. Sacco should be in treatment as soon as possible with an experienced sex offender treater for the purpose of understanding fully the motivations that led to him to engage in this illegal behavior, develop a cognitive reframing of his interests in this kinky sex, fetishism behaviors so that he can begin to diminish the interest, replace it with more prosocial sexual interests, help him work through and understand how his past traumas affected his dysregulated sex drive.  And these are all the kinds of classic sex offender characteristics that an experienced therapist can work with in a structured sex offender treatment program.

Q.   Have you reached a conclusion or do you have an opinion as to the importance of beginning this sexual offender treatment immediately?  How important is the immediacy of the treatment?

A.   I think it's extremely important for Mr. Sacco to begin the treatment now.

Q.   Why?

A.   Mr. Sacco's hypersexual and sex addiction behavior has been going on for many years, and the arrest brought this all to his consciousness, and the conditions that he finds himself in with facing these very serious federal charges has led him to, for the first time, face what his past history of trauma has done to dysregulate his sexual life, his sexual

health.  And so his defenses are now broken down and this is the opportunity for him to, now that he's no longer in this state of kind of repression and denial, to engage in some very fruitful and productive cognitive behaviorally-oriented sex offender treatment.  And this is the kind of thing that can really have an impact on changing his psychology, really reducing the risk factors that he can ever engage in any kind of reoffending behavior in the future.

Q.    Have you taken any steps to arrange for private sex offender treatment and therapy, should he be released from detention?

A.    Yes.

Q.    What steps have you taken?

A.    So I contacted a colleague of mine who does exactly this kind of sex offender treatment.  I shared with her the nature of the arrest and what I found in my assessment.  And her name is Dr. Must, and she's a former president, past president, of the New York State Chapter of the Association for Treatment of Sex Offenders, and she runs a very well-regarded sex offender treatment practice.  And she informed me that she would -- could and would be available to treat Mr. Sacco and believes that he could do very well under conditions of community-based treatment at this time.

MR. GOTTLIEB:  And, Your Honor, if we can, for the purposes of this hearing, Defendant's Exhibit D is the CV for

Shoshanna Lea Must, M-U-S-T.  May that be received in evidence?

THE COURT:  Yes, it is.

MR. GOTTLIEB:  Thank you.

(Defendant's Exhibit D received.)

CONTINUING BY MR. GOTTLIEB:

Q.   So now, Doctor, finally with regard to the dangerousness to the community or to children, if I could just address that very briefly.  Based on your evaluation, based on the information you received, I would ask that you assume the following facts for the hypothetical:  Assume the conditions of release that the defense has proposed -- and that has been provided to you, correct?

A.   Yes.

Q.   You have seen the conditions that were already in effect, as well as the defense additional proposed conditions?

A.   Yes.

Q.   Okay.  So assume those conditions, including the defense additions; assume further that Mr. Sacco is released to home confinement under all of those conditions; assume further that he will always have adult supervision, 24 hours, seven days a week, in his home; assume no underage children will ever be permitted in the house; assume he will not have any access to the Internet or any computers in the house.

Assuming all of those facts, together with the other conditions, do you have an opinion to a reasonable degree of medical and psychiatric certainty whether Mr. Sacco, if released, poses a danger to the community and, specifically, underage children?

A.    I have an opinion.

Q.    What's that opinion, please?

A.    That under -- given the circumstances of his -- of what motivated him and facilitated his sex offender behavior, and under the ripeness for treatment that he poses right now, and under the conditions that have been outlined for his home confinement, that I find that he is not at risk to re-offend while released to home; certainly not at risk to be a danger to underage children.

Q.    And, finally, based on your evaluation, your work in this case, how would you describe Mr. Sacco's attitude and motivation to address his psychiatric issues?

A.    He demonstrates remorse and humility over what has occurred.  He has come to terms with the fact that he has a serious psychological problem with his sex addiction behavior, and that he has mostly come to understand the potential harm that sex offense can have against an underage victim.  And these are all the motivating factors that cause him to want to enter treatment as soon as possible, change the person that he has become, work through all of these

(ERIC GOLDSMITH, MD - DIRECT - BY MR. GOTTLIEB)     36

traumas that have contributed to his sexual disorder.

Q.   Doctor, your experience has included dealing with prisons and the treatment programs, if any, that exist in our prison system?

A.   Yes.

Q.   In your opinion, are there adequate substitutes to the private therapy that you have recommended here in prison?

A.   In my opinion, no.  There are -- given Mr. Sacco's complex sexual addiction problem and the motivations that led him and facilitated his defendant behavior, that it's the individual and group treatment that can be provided in the community, under a private sex offender treater, that is the absolute treatment of choice and that can have the most impact on reducing his risk factors for future dangerousness.

Q.   And again, really, just final, what, if any, impact does delaying that type of, in your opinion, effective therapy, what impact on Mr. Sacco would occur should there be a delay in starting that private therapy?

A.   Delay in treatment will likely result in Mr. Sacco once again hardening some of these psychological defenses.  It will make treatment in the future that much more difficult.  Because of the unmasking of everything right now, he is so ripe to participate in treatment.  And an individual counseling at this moment in time would have a great impact

on changing his overall psychological makeup.  Delay will produce just a hardening of his defenses, which will make treatment that much more difficult.

MR. GOTTLIEB:  Your Honor, thank you.  I have no further questions.

THE COURT:  All right.  Very good.

Mr. Vickey?

MR. VICKEY:  Just for expediency, here's two exhibits that the government is going to use.  May I approach?

THE COURT:  You may.

MR. VICKEY:  Those are the chats that I believe the doctor's referring to and the second set of chats that I don't believe the doctor referenced.  Those are Government Exhibit 1, the large -- the 223-page chats, and Government Exhibit 2, his 10-page Wire chats, W-I-R-E.

(Government's Exhibits 1 and 2 marked.)

CROSS-EXAMINATION OF ERIC
BY GOLDSMITH, MD, BY MR. VICKEY:

Q.   Good afternoon, again, Your Honor -- or, I'm sorry -- Dr. Goldsmith.

A.   Good afternoon.

Q.   The defendant understood that you were not his treating physician, correct?

A.   That's correct.

Q.   Okay.  And he knew the purpose of the report was at least in part to make a determination or recommendation as to whether he could be released pending trial, correct?

A.   Yes.

Q.   Okay.  It's important for a person you're speaking to to be honest, correct?

A.   Yes.

Q.   Okay.  And because if they're not honest, does it -- it becomes more difficult to make an accurate risk assessment or a diagnosis, correct?

A.   It could be, yes.

Q.   And so prior to speaking with Mr. Sacco, did you discuss the importance of him answering all of your questions truthfully and completely?

A.   Yes.

Q.   Not withholding any information from you?

A.   Yes.

Q.   Okay.  Other than meeting with Mr. Sacco, you said you reviewed the 223-page FetLife chats between Mr. Sacco and the undercover?

A.   Yes.

Q.   And that's now Government Exhibit 1 -- I'm sorry.  You don't have a copy (indicating).  Government Exhibit 1?

A.   Yes.

Q.   Okay.  Is this the chats that you reviewed?

A.    Yes.

Q.    Okay.  And those were approximately between October of 2025 and January 23rd of 2026, correct?

A.    Yes.

Q.    Did you review the screen recording of the FetLife chats and the associated images that were sent back and forth?

A.    I did not.

Q.    You reviewed the DOJ press release?

A.    I did.

Q.    The criminal complaint here?

A.    I did.

Q.    Did you review the ten pages of Wire chats between defendant and the undercover that's Government Exhibit 2?

A.    I did not.

Q.    Are you familiar with what "Wire" is?

A.    It's -- I just know from what -- how it's referred to in the chat, that it was some vehicle in which things could be exchanged, could, I guess, not be discovered or more difficult to be discovered by -- in the public.

Q.    Okay.  And are you aware that photographs were exchanged between Mr. Sacco and the undercover?

A.    I'm aware from the chats, yes.

Q.    Did you review those photographs?

A.    I did not.

Q.   Okay.  Did you know that there are approximately nine photos that the defendant sent the undercover of -- I'll say for the purposes -- since we're in open court, "relatives" -- relatives of Mr. Sacco?

A.   I saw that there were references to those, but I don't know how many, no.

Q.   And one of those relatives was referenced as a five-year-old?

A.   That's correct.

Q.   And did you observe one of the images of Mr. Sacco ejaculating on a photo of the purported ten-year-old minor?

A.   I did not observe any images, no.

Q.   Did you know that seven photos approximately of the purported ten-year-old were requested by and sent to Mr. Sacco?

A.   I don't know how many, but I know that that was part of the chat, yes.

Q.   Did you review the video that defendant sent the undercover on January 23rd, 2026, of Mr. Sacco ejaculating on a photo of the purported ten-year-old child?

A.   I did not.

Q.   Did you review the approximately 14-second audio clip of the ten-year-old child purportedly engaged in a sex act with her father?

A.   I did not.

(ERIC GOLDSMITH, MD - CROSS - BY MR. VICKEY)        41

Q.    Did you review the search warrant returns for Mr. Sacco's Google account *BikerGuydc429@gmail.com*?

A.    I did not.

Q.    Did you review the recorded -- audio- and video-recorded interview of Mr. Sacco by law enforcement on January 23rd?

A.    I did not.

Q.    Did you review any other discovery provided by the government in this case that was provided to the defense, other than what you've listed in your report?

A.    Can you ask that question again?

Q.    Sorry.  Did you review any other discovery provided by the government in this case other than what was listed in your report?

A.    No.

Q.    Okay.  Turning your attention to --

A.    Oh, I should just add, there was a probationary report that I reviewed this morning.

Q.    Okay.  Well, that was -- I apologize.  That was an inartful question.  So the government -- so putting aside the probation report, nothing else, no other discovery provided by the government?

A.    No.

Q.    So turning your attention to the April 27th psychiatric report, we'll call that "the final report."

A.    Yes.

Q.    And then the prior report, which is Exhibit B of the defense motion, it's Document 20-3, we'll call -- that's dated March 20th, we'll call that "the initial report."

A.    Yes.

Q.    Do you have a copy of your final report and your initial report?

A.    Yes.

Q.    Okay.  Are you familiar with the phallometric test for offenders?

A.    Yes.

Q.    Can you briefly describe what that is?

A.    There is a type of test that can be used to measure blood flow through the penis, and you show a person, a defendant, images and if there is arousal to a certain image, then you'd see some blood flow, and the phallometry kind of measures the blood flow.

Q.    Did you conduct this test on the defendant?

A.    No.

Q.    Are you familiar with the Affinity Sexual Interest Viewing Time test?

A.    Yes, it's the Abel test.

Q.    Can you describe generally what that is?

A.    It's also a type of test that can be used and has some use in certain populations where a person can be given a

series of images and there is a measure of how fast someone will click on the image, and there is some belief that you can measure sexual arousal patterns based upon how fast someone might click on a particular image.

Q.   And did you conduct that test on Mr. Sacco?

A.   No.

Q.   Are you familiar with the Abel and Becker Card Sort?

A.   I think it's -- again, it's part of the Abel exam and it additionally measures -- attempts to measure certain sexual arousal interests.

Q.   Did you conduct that test on Mr. Sacco?

A.   I did not.

Q.   Did you conduct a polygraph test on Mr. Sacco to attempt to determine if he was being truthful with his answers?

A.   No.

Q.   Okay.  Are you familiar with the LOOK, L-O-O-K, Assessment?

A.   That I am not, no.

Q.   Okay.  So you did not perform that test on Mr. Sacco?

A.   No.

Q.   Are you familiar with the Hypersexuality Behavior Inventory?

A.   No.

Q.    Okay.  So you did not conduct that test on Mr. Sacco?

A.    No.

Q.    Are you familiar with the Static Risk Assessment or Static-99R?

A.    Yes.

Q.    Okay.  And what is that generally?

A.    The Static-99R is a -- essentially a test that's used to evaluate people convicted of sex crimes to see whether or not they pose a risk by history; they have certain historical risk factors for future dangerousness.

Q.    Did you perform that test on Mr. Sacco?

A.    No.

Q.    Are you familiar with the Dynamic Risk Assessment or the STABLE-2007?

A.    Yes.

Q.    And can you briefly describe what that is?

A.    It's also an assessment tool that's commonly used in people convicted of sex-offender crimes to -- and you not only are taking the historical factors that can have some relevance, but you're also looking at some factors that might -- are called "dynamic factors" that can change over time, and so you do an assessment of both historical and dynamic factors.

Q.    Did you conduct that test on Mr. Sacco?

(ERIC GOLDSMITH, MD - CROSS - BY MR. VICKEY)      45

A.   No.

Q.   You spoke to Mr. Sacco on three different occasions, correct?

A.   Correct.

Q.   And two separate conversations with his wife, correct?

A.   Yes.

Q.   In your report, you state that Mr. Sacco -- this is in the final report, Pages 4 and 7 -- quote, "identifies himself as heterosexual other than the two males he had sexual contact with," correct?

A.   Yes.

Q.   In your March 20th, 2026, draft report, you noted that, quote, "Mr. Sacco reports that as an adult, he had a handful of female sexual partners, no male sexual partners," correct?

A.   Correct.

Q.   Did Mr. Sacco discuss any other instances of sexual contact with women since becoming an adult, other than those ones that he identified there?

A.   Ask the question again.

Q.   Did Mr. Sacco discuss any other instances of sexual contact with women other than the ones he mentioned, "a handful of female sexual partners"?

A.   I'm not sure how to answer that question.

Q.   Other than a handful of female sexual partners, did Mr. Sacco at a later time discuss, *Oh, I have to go back.  I had even more female sex than a handful -- you know, I had a multitude of female sexual partners*; anything like that?

A.   No, I never came back to ask him questions along those lines.

Q.   Did he ever discuss having any other sexual contact with men since becoming an adult?

A.   He did not discuss that with me, no.

Q.   In 2017, Mr. Sacco disclosed to his wife that he wanted her to join him in, quote, "kinky romantic experiences," correct?

A.   Yes.

Q.   And so he told his wife about his interest in engaging in, quote, "kinky sexual acts," correct?

A.   Yes.

Q.   Humiliation fantasies?

A.   Yes.

Q.   Quote, unquote, "Cuck fantasies"?

A.   Yes.

Q.   Quote, unquote, "Taboo sexual acts, like engaging in sexual acts with her and engaging in other men while on vacation"?

A.   Yes.

Q.   Did Mr. Sacco ever discuss with his wife any

attraction to children?

A.   No.

Q.   Okay.  Any attraction to his five-year-old relative?

A.   No.

Q.   Eventually he and his wife engaged in couples sex therapy to feel more comfortable in exploring consensual kinky sex acts, correct?

A.   Yes.

Q.   Were there any improvements from that couples therapy?

A.   Temporarily.

Q.   So, in other words, short-lived?

A.   Yes.

Q.   In the fall of 2025, did Mr. Sacco's wife inform him that he did not want to pursue -- or she did not want to pursue kinky sexual behaviors anymore?

A.   Yes.

Q.   And it's at this point his sexual behaviors and interest in FetLife intensify, correct?

A.   I would say, yes.  I think that's correct, not that they had not been intense before, but they definitely intensified after that.

Q.   In your report it says, quote -- this is Page 5 of the final report -- quote, "Over time, defendant's need to

(ERIC GOLDSMITH, MD - CROSS - BY MR. VICKEY)        48

engage in kink sexual fantasy and behaviors had become more intense and it escalated in frequency," correct?

A.    That's correct.

Q.    Now, I'm going to show you for identification -- I don't know if I am going to admit this.  Do you recognize this (indicating)?

A.    Yeah.

Q.    What do you recognize this to be?

A.    My note from April 7th, 2026, with my interview with Ms. Sacco, Pilar Sacco.

MR. VICKEY:  I'll show Your Honor as well (indicating).  Sorry.

Q.    So if you go down, let's see, one, two, three, four, five, six, seven, eight, nine, looks like the tenth line, it looks like it starts "His judgment."

A.    Mm-hmm.

Q.    Can you read Lines 10, 11 and 12.  I couldn't understand your handwriting.

A.    My note, what I wrote here is, "His judgment when having is similar to his judgment when drunk."

Q.    "When having"?

A.    That's what it looks like to me, yes.

Q.    Is there any chance it could be "when horny"?

A.    Oh, possible, I guess.  Yeah.

MR. VICKEY:  All right.  I'll admit Government

Exhibit 3.

THE COURT:  I'll admit it.

MR. VICKEY:  What's that?

THE COURT:  I'll admit it.

MR. VICKEY:  Okay.

(Government Exhibit 3 received.)

CONTINUING BY MR. VICKEY:

Q.   You state and you just previously testified, and this is from Page 8 of your final report, quote, "He does not place himself in situations where he's in close proximity to prepubescent or underage postpubescent children," correct?

A.   Yes.

Q.   However, in your draft report, Page 2 of your draft report, starting on Page 1 going on to Page 2 --

A.   "Draft report" meaning the first one?

Q.   Yes, the initial.  I apologize.

A.   Mm-hmm.

Q.   Are you there?

A.   Yeah.

Q.   Okay.  You stated Mr. Sacco was, quote, "An active member of the community youth and school ice hockey programs."  So it appears he was placing himself in situations in close proximity to prepubescent and underage postpubescent children?

A.   That's an error.  I think he was never a part of the

(ERIC GOLDSMITH, MD - CROSS - BY MR. VICKEY)        50

youth programs.  I think it was all adult programs.

Q.    Okay.  So this is Defense Exhibit C, Docket 20-4.
It's from the other page.  If you want to take a look at
that.  Have you ever seen this photo before?

A.    No.

Q.    Okay.  Do you recognize the person in the top left
of the photo?

A.    Looks like Mr. Sacco, yes.

Q.    Okay.  Are you familiar with a bantam hockey -- what
a bantam hockey team is?

A.    No.

Q.    Would it surprise you to learn that it's children
who are ages 13 to 14?

A.    No.

Q.    Did you know that Mr. Sacco participated with the
New York Islanders, quote, "kids in the community and learn
about ice hockey," a program called, quote, "Break the Ice?"
Did you know that?

A.    No.

Q.    Okay.  And did you know that Mr. Sacco and his
teammates from, I believe, the Nassau County team, quote,
"volunteered to teach kids to skate and use the equipment?"
Did you know this?

A.    No.

Q.    Okay.  Coaching youth hockey would put you in close

proximity to children, correct?

A.    Absolutely.

Q.    Okay.  In the locker rooms with children when they're getting changed?

A.    Absolutely.

Q.    Now, going to Government Exhibit 1, the 223-page chat, these are the chats, again, that you reviewed?

A.    Yes.

Q.    And Government Exhibit 2, you previously stated you did not review these?

A.    No, 2 is the large 260-somewhat page -- two hundred and somewhat 30 pages of the chats, right?

Q.    Government Exhibit 2, I believe, is a ten-page -- there are two separate --

A.    Oh, okay.  Government 2 I did not review.

Q.    Okay.  Those are the Wire chats?

A.    Correct.

Q.    In your report, your final report, on Page 7, you state, quote, "His chatting with the undercover primarily involved consensual kinky sexual fantasies and behaviors. However, when the content involved the fictitious ten-year-old, the behavior changed to nonconsensual," correct?

A.    Yes.

Q.    Approximately what percentage of it would you say

the chats in Government Exhibit 1 between the UC and the defendant involved, quote, "consensual kinky sexual fantasies and behaviors" and not that of discussing the ten-year-old?

A.    That's a very difficult question to answer.  My recollection is reviewing the chats, they're -- by about a hundred pages in, he starts -- the undercover shares that he is the undercover and has a sexual contact of some sort with the fictitious child, and then there are conversations that occur from then on forward engaging in sexual talk about the under -- about the fictitious ten-year-old.

Q.    Okay.  So on Page 7 of your report, final report, quote -- let's see.  It says, quote, "being aroused by consensual kinky sexual thoughts and fantasies is considered non-pathologic and within the spectrum of a normal sexual arousal pattern," correct?

A.    Yes.

Q.    And, quote, "The behavior is only defined as deviant sexual arousal when it morphs into nonconsensual acts," end quote, correct?

A.    Yes.

Q.    And then on Page 8, it says, quote, "No interest and reports not being aroused by nonconsensual sexual activity," correct?  This is for Mr. Sacco.

A.    Can you read that full sentence again, please?

Q.    Sure.  It says -- this is in the second -- the first

full paragraph, third line from the bottom.

A.    Just --

Q.    Page 8 of the final report.

A.    Which paragraph now?

Q.    The first full paragraph starting, "Using the sex offender research."

A.    Yes.

Q.    So the third to the last sentence on the far right side, it says, "He has no interest," going onto the next.

A.    Mm-hmm.

Q.    So quote, "He has no interest and reports not being aroused by nonconsensual sexual activity."

A.    That's true.

Q.    You would agree that any sexual act, be it inappropriate touching, oral sex, penetrative sex, between an adult, someone over 18, and a ten-year-old child is nonconsensual, correct?

A.    I would.

Q.    Okay.  Do you agree that there are no sexual acts that can be consensual between a ten-year-old and an adult?

A.    Yeah.

Q.    Okay.  So turning to Page 7 of your final report, it says, quote, "There is no identified behavior of Mr. Sacco being sexually aroused by images of underage individuals," and then on Page 2 of your report, quote, "Mr. Sacco does not

appear to be sexually aroused by prepubescent or postpubescent children."  Page 2.

A.    Correct.

Q.    Okay.  So turning to Page 474, and the pages are down on the bottom right of Government Exhibit 1.

A.    47 --

Q.    474.  So actually it starts on 473.

MR. VICKEY:  I'll just proffer to the Court, "bkrgy429" is the defendant; "redacted" is the undercover.

Q.    If you want to read the "bkrgy429" that's at the top of Page 474, and I'll read the "redacted," and I'll tell you when to stop.

A.    "Love that u trust me with your daughter's pics," smiley face.

Q.    "I truly do. Wow thx!! Here's the snow queen. Lol."

MR. VICKEY:  And I'm proffering to the Court that a photo was sent -- an age-regressed photo was sent of the purported ten-year-old.  That's the blank space "6wDec 3, 2025."

Q.    And Mr. Sacco's response is?

A.    "Would i be out of line if I said that I'm a bit aroused by this pic?"

Q.    Now, turning to Page 493.  If you want -- in the middle of the page, Mr. Sacco with "this might be a big ask," if you want to start reading there.

A.    "This might be a big ask, but would you feel comfortable sending some more pics of K-Y?" or "Ky." "Maybe in a more erotic setting?  Would love to see her as you see her behind closed doors."

Q.    And if you could skip ahead to the middle of Page 494 with the sentence for Mr. Sacco, "And whenever you're ready."

A.    "And whenever you're ready to send some pictures, perhaps I can show you how much they turn me on while I look at them."

Q.    And here Mr. Sacco is referring to pictures of the ten-year-old, correct?

A.    He's referring to pictures of the ten-year-old and showing the undercover how aroused he gets.

Q.    Okay.  That was the fire emoji?

A.    Yes, that's a fire emoji.

Q.    Now, going on to Page 620, the first -- it says in your report, Page 7 of your final report, quote, "He does not receive pleasure from sadistic sexual acts," end quote?

A.    Yes.

Q.    And Page 2 of your draft report, quote, "He does not receive pleasure from inflicting pain on others or causing suffering," end quote?

A.    Yes.

Q.    So now, again, Page 620 of Government Exhibit 1.  If

you want to start at the second to the last with -- from Mr. Sacco, if you want to start reading, "Fuck, yeah."

A. "U think she would enjoy talking with me as I tell her what I wanna see?  Like if I asked her if she likes playing with daddy's cock, would she say yes I love playing with daddy's cock."

Q. Undercover: "Oh fuck thats hot.  Yea lets try that when we can.  You tell her to play with my cock and tell her maybe what a good girl she is when she strokes or blows me."  Do you want to keep reading?

A. "Omg yes!!  Will u cum on her face?  Or in her mouth?  Or anywhere else?"  Then smiley face.

Q. Undercover:  "How about you tell us as we play that will be hot.  Tell her where to take it."  If you want to keep --

A. "3H3 hours ago."

Q. Are those -- fair to say those are emojis that have kind of an "oh" face?

A. I would say that's correct.

Q. Can you keep reading, please.

A. "Didn't think I'd be this turned on this early today haha."

Q. Undercover:  "I know!!  Fukkin seriously."

A. Should I continue?

Q. Yes.

A.   "I hope i don't cum fast during our call.  I know I'm gonna be so turned on."

Q.   Undercover:  "Oh fuck I know!!!  Same here!!!" Undercover:  "We'll have to like think about baseball or something.  Lol."

A.   "Then I'll think about her during a baseball bat --" "using a baseball bat on her tight pussy."

Q.   Undercover:  "Holy fuck."  Undercover:  "Like an actual bat.  Youd wanna see that if we can get one of those like small ones?"

A.   "Yeah the mini ones.  Picked one up in Cooperstown once.  Still pretty thick, but just small enough to fit inside someone."

Q.   Okay.  Doctor, would you consider ejaculating on a child's face a sadistic sexual act?

A.   I would consider that a sadistic sexual act, yes.

Q.   Would you consider inserting a miniature baseball bat into a child's vagina a sadistic sexual act?

A.   I would, yes.

Q.   Turning to Page 591 of Government Exhibit 1, second to the last sentence for Mr. Sacco starting "That works."

A.   "That works!  Maybe you can get a tiny plug for her too if you want to introduce her to some ass play."

Q.   And are you familiar that Mr. Sacco endorsed the purchase from Amazon of various butt plugs for the purported

ten-year-old?

A.   I did, yes.

Q.   Would you consider inserting a butt plug into a child's anus a sadistic sexual act?

A.   I would.

Q.   Now, turning to Page 537 to 540.  I'll start at the bottom, and then you can read Mr. Sacco's part.  This is Page 537, Exhibit 1.  "Thanks for asking and we prob should I guess.  I don't think theres any hard limits.  Maybe just no marks where someone can see?   Like no bruises or anything.  Not really into scat stuff either but not opposed to much more.  Maybe some water sport stuff if we wanna get really taboo.  Only what youd be cool with seeing too."

A.   "I agree on the marks.  And the scat.  I do love water sports.  I think seeing that would definitely get me turned on!"

Q.   Next line of Mr. Sacco.

A.   "Do u have any toys?"

Q.   Undercover:  "Ok very cool.  Maybe at some point i can bring her into the tub and have a little water sport fun w her too.  Wasnt sure if that is ok w you.  Not for everyone.  Lol."

"Havent used any toys on her yet to be honest.  I did get her this vibrator thing that is like remote control which is sorta cool haven't used it yet, but she puts like a

small thing inside her and I can remote control it from like an app on my phone.  I thought that could be a lot of fun."

A.   "I absolutely love water sports.  Everything about it.  Sometimes I play with my own.  that toy sounds like it could be fun.  Do you think she would be comfortable peeing for me?"

Q.   Undercover:  "I think she totally could be.  Ill give her some gatorade before we do the call or if we meet on the way down, get her good and full. I think that would be wild to see her piss on you."

"Is that what youd want or just pee in general?"

A.   "I'd love to see anything pee related.  U peeing on her, her peeing on you or in general, in person, I should love to have her pee in my mouth."

"Do you think she would be comfortable tasting it?"

"I'm home stroking to our conversation."

Q.   And is there a fire emoji?

A.   Yes.

Q.   Would urinating on a child or making her drink urine be a sadistic and/or masochistic sexual act?

A.   Yes, it would.

Q.   Would binding someone's wrists, can that be associated with sadomasochism?

A.   Yes.

Q.   Now, turning to Page 484.  So at the bottom if you

want to read, "Any new pics."

A.    "Any new picks of Ky I could see?"  Smiley face.

Q.    Undercover:  "I thought this one was pretty hot."

"Please do not share it.  totally trust ya."

MR. VICKEY:  And a photograph is sent that I'm proffering to the Court of the age-arrest undercover with hands bound with a scrunchie.

Q.    And what is Mr. Sacco's response?

A.    "Absolutely beautiful," smiley face with heart eyes.

"This exchange is our little secret."

"When you greet each other, do you and Ky kiss on the lips?"

"Saw the pic as soon as I woke up. Just realized her hands are tied."

Q.    Undercover:  "Super hot right???"

A.    "Absolutely amazing."

"Did she like taking that pic for you?"

Q.    Going back to "Absolutely amazing," was there an emoji with heart eyes?

A.    Yes.

Q.    Okay.  On Page 8 of your final report, it said, "When around his extended family and their children, Mr. Sacco has, by all accounts, acted appropriately and has never evidenced behaviors that were of concern to his wife or extended family," correct?

A.    Yes.

Q.    Is there any indication that his family knew that he sent multiple photos of children as young as five that he identified as his relative?

A.    There is no indication that his family knew that he sent photographs of children in his family.

Q.    In fact, he discussed sexual interest in those relatives as young as five, correct?

A.    He did in the chats.

Q.    And that was rather early in the chats with the undercover, correct?

A.    I can't tell you when, but it was in the start of the conversations about children with the undercover.

Q.    So turning to Page 434 of Government Exhibit 1, and this is -- how many pages in the chats is this?

A.    Six pages in.

Q.    Okay.  So fair to say very early on?

A.    You're asking me about a picture that --

Q.    No, no.  Is it fair to say that these chats are early on in the chat relationship between Mr. Sacco and the undercover?

A.    Yes, Page 6 of the chats, yes.

Q.    And it's -- in fact, the date is, it looks like, November 2nd on Page 433?

A.    Yes.

Q.  So if you want to start reading from Mr. Sacco, "What is it like being naked" on Page 433 up near the top.

A.  "What's it like being naked with your daughter at home?  What kinda naughty stuff do you do," smiley face.

Q.  Undercover:  "Not to sound weird but I love the everyday things of being naked w her in the kitchen and having her help me cook and touching on purpose or even rubbing up against her.  I haven't been inside her yet but I've started going down on her."

A.  "I slowly got harder and harder as I read that," with an emoji.

Q.  Keep going.

A.  "How does she taste? Has she played with your cock?"

Q.  Undercover:  "Ugh.  I love it.  Glad you like it."

"Tastes sweet and love how she responds.

"She has some.  I am teaching her how to stroke."

A.  "Fuck that sounds so hot.  How tall is she and what's her body like?"

"Is it just the two of you at home?"

Q.  "She's little.  Petite and smooth.  Just us yea."

A.  "That's amazing.  Do many people know about this side of you?"

THE COURT:  Mr. Vickey, I get the point.

MR. VICKEY:  Okay.  I'll fast forward to -- could you -- just three lines more.

Q.   If you want to read, "Only a couple."

A.   "Only a couple of people know I feel the same -- "

Q.   Sorry.  Before you say that, if you just want to replace that word "relative" instead of the word between "my" and "but."

A.   So I left off, "That's amazing.  Do many people know about this side of you."  The next text message is, "Only a couple people know I feel the same about my ▮▮▮▮ but she's a little younger than your daughter."

Q.   Okay.  And then jumping ahead to the top of Page 436.  Do you want to read that.

A.   "She's 5 but we haven't done anything, just admiring from a distance."

          MR. VICKEY:  Okay.  Your Honor, I forgot to mention at this point Government Exhibits 1 and 2 should be sealed as they contain the identification of third parties, so I ask that they be sealed.

          THE COURT:  All right.  Mr. Gottlieb, any objection?

          MR. GOTTLIEB:  No, Your Honor.

          MR. VICKEY:  In fact, just for the sake of -- because Government Exhibit 3 is the notes of Mr. Gottlieb and an identified third party, also seal that as well.  I make that request.

          THE COURT:  Understood.  Accepting.

MR. VICKEY:  No further questions, Your Honor.

MR. GOTTLIEB:  Briefly, Your Honor?

THE COURT:  You may.

MR. GOTTLIEB:  Thank you.

REDIRECT EXAMINATION OF ERIC

GOLDSMITH, MD, BY MR. GOTTLIEB:

Q.   Doctor, first you were asked a number of questions in reading the transcript, but with regard to the pictures of the relative, is it your understanding that any of the pictures that were sent were relatives who were fully clothed?

A.   Yes.

Q.   Now, AUSA Vickey went through a lot of comments made by the undercover in the texts.

A.   Yes.

Q.   Is it fair to say, without recounting them all, the undercover is -- appears to be playing along; would you agree with that?

A.   Well, the undercover offers the idea that there is a child in the house and we're naked and engages Mr. Sacco in the taboo conversation.

Q.   And, again, without going through any of what the government has now pointed out, would you agree that -- well, let me ask you, is there an impact on somebody such as Mr. Sacco who has been diagnosed, as you have diagnosed him --

what impact, if any, would it have on him if he has another party, the undercover in this case, engaging in the language and the suggestions that you heard; what impact?

A.    So that is the scenario which would open the floodgate, if you will, for Mr. Sacco to engage in this kind of addictive, kinky, taboo, sexual chat.  It's highly arousing to him to think about another man having sexual acts that are really taboo and this was highly stimulating to him.

Q.    And Mr. Sacco, as you learned, was very much involved as a hockey player growing up and coaching and organizing, correct?

A.    Yes.

Q.    Now, you were shown a picture of him.  It looked like a team photo?

A.    Yes.

Q.    You don't know what role he played with that team, correct?

A.    I do not.

Q.    But based on your understanding of the conditions that have been offered, to take away all Internet, no underage -- contact with any underage children, certainly on a hockey team, no ever allowing a child to come into the house, do you see any danger, the fact that he previously had been involved in some way with a hockey community?

A.   No, not at all.  I mean, his -- the issues that would speak to concerns about dangerousness would be whether or not he can -- whether or not he has these antisocial attitudes and behaviors, and there is no evidence that he has anything like that.  He would comply, in my opinion, with conditions.

MR. GOTTLIEB:  And then, Your Honor, if I may, I would ask that the New Paradigm Psychological Services Report, which was referred -- was requested by Federal Probation, be marked as Exhibit E and, for the hearing, placed in evidence.

THE COURT:  All right.  I agree.

(Defendant's Exhibit E received.)

CONTINUING BY MR. GOTTLIEB:

Q.   Now, you have read the report that was issued recently by the New Paradigm Psychological Services, correct, Doctor?

A.   Yes.

Q.   You saw that in the report, one of the description of the offenses included that he -- that Mr. Sacco engaged in online communications and that he sent and received images engaged in masturbation via video chat, encouraged mutual sexual behaviors with prepubescent girls.  That's on Page 2 of the report.  You saw that that agency was aware of much of what the government asked you about, correct?

A.    That's correct.

Q.    And you also learned that in that report, their finding was very similar to your finding with regard of risk, correct?

A.    Correct.

Q.    And their report also in evaluating said that with the proper supervision and therapy now, there was a good chance of treatment and no reoffending, correct?

A.    That's correct.

Q.    They talked about the absence of the antisocial factors just as you put in your report?

A.    Yes, they talked about the absence of the antisocial factors and the fact that his behavior to engage in this activity was driven by his kind of sexual addiction, not by an inappropriate sexual arousal to children and, therefore, really appropriate for treatment at this time.

Q.    And the bottom line, your report, your evaluation, based on the evidence that you saw, as well as the Paradigm Psychological Services, in effect came to the same conclusions on the issues that are relevant to the issue of detention, correct?

A.    That's correct.

MR. GOTTLIEB:  Your Honor, thank you very much.

THE COURT:  All right.  Thank you very much.

Mr. Vickey?

RECROSS-EXAMINATION OF ERIC GOLDSMITH, MD, BY MR. VICKEY:

Q.   Do you have a copy of the New Paradigm Psychological Report in front of you?

A.   No.

Q.   Do you have --

MR. GOTTLIEB:  I have it.

MR. VICKEY:  Okay.  Do you want to give it --

MR. GOTTLIEB:  May I, Judge?

THE COURT:  You may.

MR. GOTTLIEB:  (Indicating).

CONTINUING BY MR. VICKEY:

Q.   If you had to, you would rate Mr. Sacco as a low-risk level or very low-risk level, correct?

A.   Low risk.

Q.   Okay.  What was the conclusion of the New Paradigm Psychological Services offense risk?

A.   He had a one out of ten finding on the Static, and that rates him average risk.

Q.   Okay.

MR. VICKEY:  Thank you.

THE COURT:  Anything further?

MR. GOTTLIEB:  No, Your Honor.  Thank you.

THE COURT:  All right.  And just a couple questions for me, Doctor.  I appreciate your testimony.

THE WITNESS:  Sure.

THE COURT:  With regard to the Static-99R and the STABLE-2007, I got the sense you didn't do those tests because he was not post-conviction; am I wrong about that?

THE WITNESS:  That's correct.  They aren't appropriate really for pre-conviction defendants.

THE COURT:  You've described a pattern of kinky sex.  Is having sex with a ten-year-old under the category of "kinky sex"?

THE WITNESS:  No, that's a paraphilic -- paraphilic act.

THE COURT:  And the desire to have sex with a ten-year-old wouldn't be in the realm of kinky sex, correct?

THE WITNESS:  Yeah, that would be pathologic.

THE COURT:  With regard to contact and non-contact offenses, are those used in your business?

THE WITNESS:  Yes.

THE COURT:  So if an individual were to travel somewhere with a desire to engage in a sexual act with a ten-year-old, would that be considered a contact offense or no?

THE WITNESS:  If -- yes, if they take actions to engage in some meet-up, that would be considered a contact sexual act.

THE COURT:  Okay.  All right.  That's all the

questions I have.

All right.  I believe that marks the end of your testimony.  Thank you very much.  You may step down.

(Witness excused.)

THE COURT:  All right.  Mr. Gottlieb, anything further?

MR. GOTTLIEB:  No further testimony, Your Honor.

THE COURT:  All right.  Any further arguments that you want to make?

MR. GOTTLIEB:  May I?

THE COURT:  Sure.  It's your burden, so --

MR. GOTTLIEB:  Thank you very much, Your Honor, and I will try to be brief.  I know that you have reviewed everything.  But may it please the Court.

Your Honor, we respectfully request -- we are here not to try the case before a jury.  The issue is detention and whether or not there are any strict conditions, together with what Pretrial Services has already recommended, as well as the additional conditions that we have provided to your Court, that will meet all the requirements to justify and warrant setting -- setting release based on those conditions.

Your Honor, listen, we understand the allegations are serious.  We're not minimizing that.  We know further that there is -- should he be convicted, there is likely a term of imprisonment.  Everybody knows that.  We understand

how serious this is.

We know there is a statutory rebuttable presumption of detention, and that's our burden now to overcome.  The issues then are whether the presumption has been overcome.  We believe the answer is yes.  We believe, whether there are conditions or a combination of conditions that will reasonably ensure Mr. Sacco's appearance in court as required each and every time, and ensure the safety of individuals in the community and specifically underage children; are those conditions proposed now before Your Honor?  We submit the answer to that is also yes.

I will start off, Your Honor, with the recently received Probation Independent Risk Assessment Program.  I am not going to review it.  It now has been reviewed.  It's in evidence.  But we ask that you take a careful look, because this is not just some hired psychologist/psychiatrist by the defense offering sufficient grounds to conclude that Mr. Sacco is a candidate for release on bail, as long as the other conditions would ensure his appearance and protect the public.

The New Paradigm Report, Your Honor, overall is very positive.  They conducted that risk assessment using the Static-99R instrument.  The risk assessment contains both static and dynamic factors, but the key findings, Your Honor, the key findings, they had available to them all of those

facts; the questions and the answers that we heard about the allegations in this case, about masturbation, about the texts, they had all of that available to them.  And those experts concluded that Mr. Sacco was found to have only one of the ten risk factors identified in the Static-99R.  The only factor identified was an unrelated victim factor which does not apply here.  All the remaining factors did not apply to Mr. Sacco.

The Paradigm also conducted the Dynamic Risk Assessment, the STABLE-2007.  The Dynamic Risk Factor STABLE-2007 instrument, Your Honor, found the following:  It only found some problem on two of the risk factors, significant social influences and deviant sexual interest.  The only factor which it found to be a definite problem was the sex drive or sexual preoccupation.  And Dr. Goldsmith addressed that and didn't minimize that.  All of the remaining factors the Paradigm found no problem at all, including capacity for relationship stability, emotional identification with children, hostility towards women, general social rejection or loneliness, lack of concern for others, impulsivity, poor problem-solving skills, negative emotionality or hostility, sex as coping, and cooperation with supervision.

They found in his favor those problems didn't exist, and that's what we're talking about here; that between

now and when the case ultimately reaches its resolution, what we're seeking to do is to get him in an environment that is secure and that will satisfy Your Honor that the necessary steps that could conceivably ensure his appearance, that's not even an issue, but to protect even the remotest of possibilities of contact with an underage child.  Our conditions that are being proposed, Your Honor, respectfully will ensure that.

The report, just as Dr. Goldsmith found, that the risk is driven primarily by a sexual preoccupation, coupled with some degree of deviant sexual interest and poor situational control; that's their language.  But the report then said when these are controlled, Mr. Sacco's risk is likely to reduce even further.  Most importantly, Paradigm concluded that the data suggested that Mr. Sacco's risk is average and could be safely managed and treated effectively if mandated to any form or level of community supervision.

There could be no more strict terms of supervision than the conditions that we have proposed, which will include the home detention.  He's not leaving that house, other than to receive his therapy.  He's not leaving the house, so he's not going to be in the house, unless his family -- obviously so many of them are here, Your Honor.  And we provided a schedule.  His family -- this is a close-knit family.  They are not going to permit him to deviate one -- one inch from

those conditions.

So even Paradigm recognizes that with that supervision, Mr. Sacco can begin to get the treatment, because on some day in the future, Your Honor, some day, he will again be out there. And Dr. Goldsmith explained, and it's common sense, that we know that prisons, even while in detention pretrial, cannot provide the type of therapy that is highly necessary recommended here.

THE COURT: Well, that's not primarily my interest, correct? I mean, my interest is to determine whether or not he's a risk to the community, and if I find him to be a risk to the community, I would order him detained, even though that's not the best interest for him as far as his treatment goes.

MR. GOTTLIEB: I agree, Your Honor.

THE COURT: That's my overall responsibility.

MR. GOTTLIEB: I agree. And that's why the conditions that we have proposed, respectfully, we believe it addresses those very appropriate legitimate concerns.

So let's just go right to the proposed conditions because you have heard so much already and you have read all the reports, Your Honor. The conditions that we are requesting: A personal recognizance bond in the amount of a million dollars secured by two financially responsible persons --

THE COURT:  I guess I'm not so much concerned with regard to his risk of nonappearance, although I do have a concern with regard to his mental health, and I am concerned about him possibly doing something to himself based upon the statements.  So that's -- I don't have a real -- he's obviously got strong family ties to the community.  He's got a family that supports him.  I understand that.

MR. GOTTLIEB:  So let me address those concerns that you're obviously considering and that you're pointing to now.  We submit that what we have done here, adding to the typical conditions that Probation would recommend, that he would be submitting to mental health treatment, both individual -- and these were our additions, Your Honor.  And when we sent them to you, we bolded them to point out that those were the defense recommendations.  Submit to mental health treatment, both individual and group therapy once a week with Dr. Shoshanna Must for sex offense therapy.

And there, Your Honor, we understood our burden is not just to talk generally, not to say, *Your Honor, if you release him, we're going to find somebody out there*.  The CV is there.  Dr. Must is highly regarded in this field, both in the Northern District, as well as Eastern, Southern, because I have been involved in the Northern District, and Dr. Must is somebody who I believe, based upon the information I received in the past, is highly regarded here.  So she would

address that one aspect that you discussed.

Refrain from any areas frequented by children. That's taken care of because he's only going to be in his house closely supervised, bracelet, whatever is necessary. He's not going to leave the house.

And we say that all computers will be removed from Mr. Sacco's residence, not just a prohibition against use of computers that could then be searched by Probation. That's a very typical standard. We're going to make sure that before he sets foot in the house, every computer is gone. And Probation is going to be able to confirm that.

THE COURT: And I certainly appreciate that. I will tell you, in my experience, if people wish to get -- whether it's a burner phone or something else, there is an opportunity to get that. There is no -- that doesn't mean that I don't release people. Don't get me wrong. But there's no panacea, so if you tell me there is absolutely no way he can get on the Internet, that runs against my experience.

MR. GOTTLIEB: So here -- that's why we went even further. We're trying to address every possible -- but I fully am aware. There's never any guarantee in anything we ever do.

THE COURT: Right.

MR. GOTTLIEB: I know that. But we now have a

rotation of family members who are going to be physically present, not just his wife who works, other family members. We gave you the schedule. They'll be present at Mr. Sacco's home at all times to oversee him, including his wife, Mr. Sacco's mother-in-law, father-in-law, Mr. Sacco's brother Dominic, father John, stepmother Davina Sacco, Mr. Sacco's sister-in-law Renee Sacco, Mr. Sacco's aunt. We have provided the schedule. He will never ever be in that house without supervision.

And I say this to you, Your Honor: I have explained to the family, because I've had situations where Magistrate Judges, District Court Judges, have said, *Listen, if I am going to release him, Mr. Gottlieb, it's your responsibility that if you learn that he has violated, you are to inform the Court and the US Attorney*. And I have no problem doing that. In a situation like this with the concerns that Your Honor rightfully has, if you said, based on all the conditions, you are prepared to take that chance, you have somebody else. I am not going to be living there 24/7 --

THE COURT: Nor is Probation.

MR. GOTTLIEB: And Probation's not either, but every single one of the family members knows what will happen, that he's going to be thrown right back in there, and if there is any indication that he ever has access, is on the

(BY MR. GOTTLIEB)                78

computer, got a burner phone, gone.  We understand that.  And they will report it and I will report it to the government, as well as to Your Honor.

So that daily supervision, we believe people who obviously really care for him are here to support him.  We believe that will go a long way.

Also, Pretrial Services will be given remote access to Mr. Sacco's security cameras that are currently set up at his home to ensure that no minors come inside or near the home.  The cameras are set up through the Paramount CMS by InVid Tech application.  The user name and password for remote access will be provided, and we give the camera model number.  All of that would be set up, would have to be in working order, before he's ever released.

There is no other way to do it, Your Honor.  I recognize -- I mean, he could be anywhere.  He could be in Alaska and there's -- and we never really know what's going to happen.  But everything is being set up here now where the room for anyone to abuse Your Honor's decision to give him that shot -- based on the testimony you heard from Dr. Goldsmith, as well as the cross-examination, I don't believe that you will regret doing it, because also what Dr. Goldsmith said is -- based on what I have seen and spoken to him, as well as Dr. Goldsmith, he is aware, acceptance of responsibility.  He's aware of what he has to do to get

better, and he is committed and wants to resolve that treatment.

So, Your Honor, there really is nothing more that I can say. I ask you if you would go that one additional step and give him that chance based on the facts of this case. Thankfully, thankfully, he never acted on any of it. Thankfully what we have here is somebody who's not a pedophile. What we have here is somebody who's clearly overstepped the line. We -- listening to the Q and A on cross-examination, and it's -- it was feeding right into the fantasy. I'm not pointing an accusing finger at the undercover. That's not the reason I am saying that, but all of that had an impact even how far Mr. Sacco would go, knowing how far the undercover was going.

I'm sure Your Honor has been involved in cases where undercover -- they know how far they should go without, you know, possibly affecting it inappropriately. What the undercover was saying, showing how he was all in on this and he was recommending it, it certainly increased the chances -- if somebody, in fact, is suffering from this fantasy, this fetish, this over sex drive, it really did increase the chances that he would go those few steps beyond what would be appropriate.

So with that, Your Honor, I will sit down and I thank you for your consideration.

THE COURT:  All right.  Thank you, Counselor.

Mr. Vickey?

MR. VICKEY:  So, briefly, Your Honor.  Counsel just said here that defendant didn't act on his desires and his fantasies.  He did act on them.  He logged into an encrypted Wire chat where they had talked for weeks about what sexual abuse was going to happen to a ten-year-old girl.  He talked on FetLife.  FetLife -- that's why I asked Dr. Goldsmith, *Did you review the actual screen captures*, because on the bottom of FetLife -- it's a reputable web site.  People can go on there for their adult consensual relationships.  On the bottom it has a button that says "Report."  Each and every time he chats with the UC about his sexual interest in his own relatives and about the ten-year-old, there is a little button that says "Report."  He knew for three months -- he believed for three months that a ten-year-old was being sexually abused in Upstate and doesn't report it.

That in and of itself is horrible for anyone.  But this was a sworn member of law enforcement.  If anyone is going to know better than anyone else to do something about the sexual abuse of a child, whether it's his fantasy or something, it was the defendant.  And for three months he did nothing.  And not only did he do nothing, he encouraged it. He sent money to further the abuse of the child.  He logs in and he is expecting to see the abuse, and he hears what he

believes is a ten-year-old that doesn't come out.  Does that stop him?  Does that make him realize, *Oh, jeez, this is real.  I've got to stop this.  I've got to report it*.  No, his response is, *Let her cool down.  Maybe if I send a pic of me ejaculating on a photo of her, that's going to help basically lower her inhibitions even further so that I can watch a live video stream of her being sexually abused by another adult.*

The doctor himself -- you asked -- Your Honor asked Dr. Goldsmith, is a contact -- is that -- is showing up at a, you know, motel or a pre-determined place a contact offense, and he said yes.  This is the 21st century version of showing up at a hotel.  He logs into a video chat specifically with the intent to see the sexual abuse.  Whether he is going to put his hands on the child or direct the abuse, the law doesn't make a distinction.

With regard to Dr. Goldsmith's report, the reason that I asked about reviewing all of the materials is, he didn't review all of the materials.  He simply took -- talked to Dr. Goldsmith, and he took his word for it.  I have demonstrative proof that Mr. Sacco lied to Mr. Goldsmith.  How is that?  Because Mr. Sacco reports as an adult, after those instances with the other males or boys that he's with, a couple of sexual partners, female sexual partners, no male sexual partners.  In his Google search form return that was

(BY MR. VICKEY)                82

provided to the defense over a month and a half ago, there are multiple videos of the defendant engaging in unprotected sex with multiple different males.  I don't know what's more of a risky behavior than that.  He withheld that from the doctor.  If he withheld that -- I'm not making a falsus in uno argument, but that's a pretty big thing to withhold from the doctor.  The doctor can't make an accurate assessment if he's being lied to.  So if he's lying about that, it's unclear what he's lying about with other things.

With regard to other evidence of his abuse of children, the defendant wiped his phone.  He gets told by his chief that, *Hey, come on in*, and the defendant himself admits in the interview, *I had a feeling something was up*.  So what does the defendant do?  He first tells the FBI, *Oh, I had an update on my phone and it wiped it*.  Well, that's just preposterous.  No update on a phone wipes your phone clean.

And the forensic reports that were shown to the defense shows Mr. Sacco, as he said in the chats, he completely wipes his phone and deletes it so that there is no incriminating evidence.  And now the government's left with his own law enforcement, which is a concern for the government, that a law enforcement agency, in essence, tipped off another law enforcement member that something bad was going to happen, and it allowed him to wipe his phone.  So we have no idea what the evidence is.

(BY MR. VICKEY)                83

Mr. Sacco, when he's arrested, says, *Everything you need is on my laptop*.  The FBI recovered an Apple MacBook. We can't get into that.  We can't get into that, so we don't know what's in there, and the defendant himself has already indicated that there is incriminating information.

All of this to be said is that the report, Your Honor understood -- I think Your Honor understood -- the report is not worth the paper it's printed on.  I don't know how a doctor can conclude that the defendant had no sexual interest in children, is not aroused by photos, and then he has to read the defendant himself saying, *I'm aroused by this photo of a clothed child*; doesn't he want to get involved in sadistic sexual acts; multiple sexual sadistic acts.  The defendant volunteers, *Why don't we shove a bat in her vagina.* That wasn't volunteered by the undercover.  All of this goes to show that the report cannot be credited.

And with regard to conditions, I'll just briefly say, the defendant's already shown the ability to lie and deceive to his family.  If his family is there 24/7, I'm pretty sure that his family is going to have to sleep.  He is going to have the opportunity.  And he has, as the defendant says, the sexual addiction.  He has a compulsion to then get on the Internet.  And the idea that they're not going to bring in -- and that Probation can reasonably review and make sure that they don't bring any kind of electronic or Internet

capable devices is just not -- it's not a reasonable thing to ask Probation to do. It's not a reasonable thing to ask Probation to watch his house 24/7. So those are not reasonable conditions that could assure the danger to the community.

And, as I said, with regard to risk of flight, Mr. Sacco is a member, was a member, of law enforcement. He has law enforcement contacts. Maybe members of law enforcement don't believe that what he did was that severe and would help him. He has contacts. He has traveled outside the country. I believe he has extended family outside the country. I know he would surrender his passport, but that doesn't mean someone who is facing a significant period of time in jail does not have the incentive to flee and the ability to flee as a member, a former member, of law enforcement.

So for all of those reasons, the defendant should be remained detained pending trial in this case.

THE COURT: All right. Thank you, Mr. Vickey. I'm going to take a break for a couple of minutes and then I'll be back out. Thank you.

(Short recess.)

COURTROOM DEPUTY: We are back on the record at 4:51 p.m. on May 5th, 2026.

THE COURT: All right. I want to thank both

counsel.  These are very difficult decisions for Magistrate Judges to make, these particular cases.  We have many of these cases in the Northern District of New York.  We've had both good and disastrously bad results with regard to release decisions, so I do appreciate the arguments that were made for both sides.  I found them to be helpful.

I also very much appreciate the testimony of the doctor with regard to some of these matters and the New Paradigm Report which I reviewed.

So starting -- and I'll issue a written order after we're done, but starting at the beginning, as defense counsel noted, this is a presumption case, so there is a presumption in favor of detention.  I don't think that was specifically addressed by the Magistrate Judge.  My sense would be that because the defendant was employed, didn't have any criminal history, that in all likelihood we would find that the presumption is overcome.  That's not a heavy burden in these particular cases, but the issue of the presumption still remains a factor for me to consider in determining whether or not to release the defendant on conditions.

I also note there is a 15-year mandatory minimum in this particular case.  It is an extremely serious case.  And as I listen to the testimony, obviously I am struck really about the progression of what's happened here, and I'll start with, you know, what happened to the defendant as a child.

And it's just profoundly wrong as to what happened to him. And I know that he has suffered with those issues as he's continued. I know how difficult it was for him just to be here and listen to some of the testimony here today. So that's important.

What's more concerning to me, though, is the progression that we saw with regard to -- and it's outlined in the doctor's report -- with regard to his wife and their engaging in, you know, kink acts and the like, which is -- between two consensual adults I have no issues with regard to, but there appears to be in the progression to the point where they realize it was a concern, so they did treatment, which was already done in this case, and it was not successful. At some point in time, the wife indicated that she wasn't going to participate in the types of more extreme acts that the defendant was suggesting. It was at this point that he then turned to this online activity, which, you know, was more and more extreme.

I do agree with the government that in this day and age, online activity is the functional equivalent of a contact offense, especially with videos. And I am struck by the fact that, you know, this is a police officer chatting with someone who he thinks is the father of a ten-year-old who he's sexually abusing, and he makes no effort to do anything about it and, in fact, he gets some sexual enjoyment

from this.  That's the way I read the tweets.

So I have considered all the factors.  I do believe that the defendant poses a significant danger to the community.  I don't think that there are conditions that I can impose which would reasonably ameliorate the conditions, a lot because of his background.  And so that's my decision.  As I said, I'll do a written order with regard to that.

And there's also the issue I am concerned about, the wiping of the phone and the evidence that may have been in there.

So, again, I appreciate the arguments.  I am going to remand the defendant back to the custody of United States Marshals pending further proceedings.  Obviously, you have an appeal right, if you wish.

Is there anything else, Mr. Vickey, that you want me to address?

MR. VICKEY:  Nothing from the government, Your Honor.

THE COURT:  Mr. Gottlieb, anything further?

MR. GOTTLIEB:  No, Your Honor.  Thank you.

THE COURT:  All right, thank you, everybody.

COURTROOM DEPUTY:  Court is adjourned.

*     *     *

### *CERTIFICATE OF OFFICIAL REPORTER*

I, **JACQUELYN BURKE GECEWICZ**, Federal Official Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 21st day of May, 2026

**/S/JACQUELYN BURKE GECEWICZ**

JACQUELYN BURKE GECEWICZ,
Official Court Reporter

# *I N D E X*

| *W I T N E S S E S* | *DIRECT* | *CROSS* | *REDIRECT* | *RECROSS* |
|---|---|---|---|---|
| ERIC GOLDSMITH, MD | 4 | 34 | 64 | 68 |

| *E X H I B I T S* | | *ID* | *EVD* |
|---|---|---|---|
| Government's 1 | 223-page Chats | 37 | -- |
| Government's 2 | 10-page Wire Chats | 37 | -- |
| Government's 3 | Dr. Goldsmith's Note | 49 | 49 |
| Defendant's A | CV - Dr. Goldsmith | 5 | 5 |
| Defendant's B | Final Report - 4/27/26 | 20 | 20 |
| Defendant's C | Two DMS Sections | 28 | 28 |
| Defendant's D | CV - Shoshanna Lea Must | 34 | 34 |
| Defendant's E | New Paradigm Report | 66 | 66 |

\*     \*     \*