IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No. 1:26-CR-031 (MAD) |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **ROBERT SACCO**, | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ROBERT SACCO'S MOTION FOR REVIEW AND APPEAL OF MAGISTRATE JUDGE DANIEL J. STEWART'S DETENTION ORDER**

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .................................................................................................................. 1

1. Defendant Communicated with an Undercover Officer About Sexually Exploiting a 10-Year-Old Girl ........................................................................................................ 1

2. Arrest and Interview ........................................................................................................ 7

3. Complaint and January 24 Detention Hearing in the Eastern District of New York .......... 8

4. Indictment, Northern District of New York Detention Hearing, and Decision .................. 9

ARGUMENT ..................................................................................................................... 13

I. THERE ARE NO CONDITIONS THAT WILL REASONABLY ASSURE THAT DEFENDANT WILL NOT FLEE OR POSE A DANGER TO THE COMMUNITY ............... 13

A. Legal Standard ................................................................................................................ 13

B. Defendant Has Failed to Rebut the Presumption That No Conditions Will Reasonably Assure His Appearance in Court and the Safety of the Community ...................................... 14

CONCLUSION .................................................................................................................. 25

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in opposition to defendant's appeal of Magistrate Judge Daniel J. Stewart's detention order. *See* Dkt. 38. For the reasons set forth below, defendant should remain detained because he is both a danger to the community and a risk of flight, and no combination of conditions can mitigate these risks.

## BACKGROUND

### 1. Defendant Communicated with an Undercover Officer About Sexually Exploiting a 10-Year-Old Girl

Many of the following allegations are also detailed in the January 23, 2026 criminal complaint, which are incorporated by reference. *See* Dkt. 1. In or about October 2025, defendant began chatting online with a Federal Bureau of Investigation ("FBI") undercover officer ("UC") posing as the father of a 10-year-old daughter with hearing and speech issues. During those communications, defendant discussed masturbating while watching a live video stream of the UC sexually abusing his daughter. Defendant also discussed his sexual interest two minor female relatives that he had access to, including a 5-year-old girl. To obtain photos of the purported 10-year-old, defendant sent the UC multiple photos of his two minor relatives. Defendant also discussed a future party with other children he would be attending and explained that he could get additional photos of minor children and send them to the UC. In exchange, he proposed that the UC send naked photos of the 10-year-old with a bar obscuring the girl's identity. Defendant also expressed an interest in traveling to the Albany area to masturbate from a distance while "admir[ing]" the child. He also proposed showering with her "if she would be interested."

On or about January 4, 2026, defendant requested naked photos of the UC's minor daughter "in a more erotic setting" and expressed his desire to "see her as you see her behind closed doors."

Defendant also told the UC, “I would absolutely love to set something up in person, the proximity will make it tough but I'm willing to try and make it work if we can! And not offended at all, I totally get it. Maybe we can work up to video chatting together one day to start?” That same day, defendant asked the UC if the UC thought it would be good for the 10-year-old child to watch him masturbate and ejaculate on camera. The UC stated he would never ask for a video or picture of defendant’s penis, but if he thought that would make the minor more comfortable, then he would be open to it. In response, defendant sent a photo of his erect penis and said he “would be honored to help her learn and grow.” He also wanted to hear what the UC’s daughter thought of his erect penis picture. Defendant wrote, “Had a thought too, do you think you like for her to watch me cum for her on cam? Maybe watch me stroke and explode all over myself for her?” He went on, “I can't wait to hear what she thinks of it ;) she would look to amazing with it resting on her beautiful face. . . ”

From January 5 through January 7, defendant asked the UC whether he had shown the image of defendant’s erect penis to his daughter and proposed that if she “likes what she sees” then they could arrange a video call. On January 7, defendant volunteered to purchase an outfit for the 10-year-old child to help her be more comfortable about engaging in sex acts. He perused the internet for ideas and sent the UC the following Amazon links to girls’ underwear and bras:






To pay for these items, defendant sent the UC prepaid debit card information.

On January 8, defendant suggested that he and the UC video chat while masturbating so they could discuss the 10-year-old child. Defendant also asked the UC, “I don't think we discussed, anything that’s off limits or things you don't want?” The UC responded, “I don't think theres any hard limits. Maybe just no marks where someone can see? Like no bruises or anything. Not really into scat stuff either but not opposed to much more. Maybe some water sport stuff if we wanna get really taboo. Only what youd be cool with seeing too.” In response, defendant told the UC, “I agree on the marks. And the scat. I do love watersports. I think seeing that would definitely get me turned on.” Defendant continued, “I'd love to see anything pee related. U peeing on her, her peeing on you or in general, in person I should love to have her pee in my mouth. Do you think she would be comfortable tasting it?” That same day, at defendant’s request, the UC emailed photos of his purported daughter to defendant so that he could masturbate to them and ejaculate on the photos. Defendant then sent back the photos with what appeared to be semen on them.

On January 8, defendant again discussed potentially coming “upstate” to meet the UC and his daughter. He proposed planning a “golf trip” and then would take a “little detour” to meet with the child. Defendant also asked if the UC ever came down to New York City with his daughter and offered to cover the cost of a hotel. On January 10, the UC informed defendant that his daughter has hearing and speech issues so “when she moans it’s like really loud and long and

sounds sorta fucked up" and asked if defendant "would be cool with it." Defendant said he had no problems and then asked the UC to "record it so I can hear it beforehand? So I know what it sounds like?" On January 15, the UC emailed defendant an approximately 14-second recording of another undercover officer pretending to be the UC's daughter. In that recording, the female UC moaned and said, in substance, "feels so good daddy." Defendant responded, "Holy fuck.... I am rock hard after listening to that 💧💧 . . . As soon as I woke up I listened to it. I really can't wait to see her make those sounds."

On January 12, another FBI undercover ("UC-2") had a video call on an encrypted application with defendant where the two of them masturbated on screen. UC-2 was using a prosthetic penis. During the call, defendant said, in substance, that UC-2's penis was much bigger but that his would fit in the UC's daughter's mouth perfect. He also said that he wanted the UC's daughter to urinate in a fancy glass and that he would drink her urine. After the video call, defendant messaged that it was "crazy hot" and then asked, "Do you think [your daughter] would like seeing my cock? . . . Can't wait to see her ;) lemme know what days are good for you."

After the video call, defendant told the UC that he got the "fist toy" inside of his anus and that the UC's daughter "would be able to get her whole arm in there." He again proposed a video call with the minor: "Mmmm how soon would you like to have the video chat with her? I can't wait 😱" Defendant also asked, "Have u told her about our plan to video chat soon? :)" While discussing the video call, defendant expressed his concern that he would ejaculate too quickly while watching the UC sexually assault his daughter. When the UC suggested that defendant "think about baseball or something[,]" defendant proposed inserting a mini baseball bat into the child's vagina.

The chat involving the UC, his 10-year-old daughter, and defendant was scheduled for the week of January 26, but defendant informed the UC that he would be traveling to Florida on January 25 so the video chat was moved up to January 23. Around this time, the UC informed defendant that Amazon rejected the prepaid debit card that defendant sent him. Defendant provided an Amazon gift card so that the UC could purchase the underwear that he had chosen for the UC's minor daughter, along with a "tiny" butt plug so that the UC could introduce her to "ass play." The UC sent "beginner to advanced" butt plugs (see below image) to defendant to see if those are what he had in mind for the UC's daughter and defendant responded, "Oooo yes!! I like :) can work up to taking the bigger one some day."




During some of their chats, defendant said he was concerned about being caught, including stating, "Do you ever use a [virtual private network][1] when chatting about such naughty things?

[1] A virtual private network, or "VPN[,]" is an encrypted method of accessing the internet that masks your IP address and makes your data and/or browsing activity private.

Every worry about privacy? Once in a while I get nervous seeing videos about people getting caught." As January 23 approached, defendant again expressed concern about getting arrested, stating, "Idk if it's just me but I have been seeing a lot of news articles about guys getting caught with inappropriate stuff on their phone and I've been like kinda worried 😅" Defendant also discussed using encrypted applications and never saving anything to his phone to avoid detection.

On January 23, at approximately 10:00 a.m., UC-2 and defendant engaged in a video chat after defendant had further discussed what sexually explicit acts he wanted the UC to perform on his daughter during the chat. Defendant did not show his face, but UC-2 was able to recognize the same voice and penis from the January 12 video chat. Defendant was masturbating while discussing, *inter alia*, having the 10-year-old child perform oral sex on the UC. UC-2 then attempted to get the purported child from a nearby bedroom, but the child refused to come out. After the video chat, defendant continued to exchange messages with the UC. During the chats, defendant asked, "Do you wanna postpone? I'm OK with another day. Just lemme know :) I'll go about my day if you guys wanna wait." After the UC agreed with postponing, defendant asked, "Any pics you wanna tease me with in the meantime: :)" followed by "If u can send here where it's safe I'd love to see it before I sign out :) Or maybe a short video?😉"

The UC responded that he had sent pictures of his daughter to defendant before and was getting nervous that maybe defendant was setting him up. Defendant responded, "Dude no worries, no I get it. Maybe I can tribute again for you? Would u wanna do that now? We can video and u can watch me blow a quick load," "She can just watch off camera" "Or just u and me." When defendant said maybe he could "tribute[,]" he meant ejaculate on a photograph of the UC's daughter as he did earlier in their conversations. When the UC told defendant, "[w]e don't have to do that now sorry for being paranoid," defendant responded, "I was hoping to cut, I'd be happy

to cut for u real quick" and clarified "cum*." Defendant stated, "I'm pretty ready to haha I can just blow a load quick." Then defendant asked the UC, "U wanna send me another pic? Or use one of the ones I did already?" The UC responded by sending defendant another age regressed picture purporting to depict the UC's daughter. Defendant asked, "Shall I print it and cum on it." Defendant then sent the UC a video of him masturbating and ejaculating on the picture of the purported child.

**2. Arrest and Interview**

On January 23, defendant was arrested at the Nassau County Police Department ("NCPD") headquarters in Mineola, New York. While being transported to the FBI Long Island office for processing, defendant made several spontaneous statements, including, in substance, "My life is over"; "I can save you the trouble, the laptop is in the living room"; and "I am just try to wrap my head around what my life looks like right now." While searching his residence, law enforcement found multiple electronic devices, including an Apple laptop computer. As of June 21, 2026, FBI has not been able to access the laptop.

During his interview at FBI, defendant waived his *Miranda* rights and admitted, *inter alia*, to chatting, both through texts and on video, with an individual upstate who had a minor daughter. When discussing being called into the police station that evening, defendant, who at that time was a NCPD internal affairs detective, stated that "had a feeling something was up" since his NCPD "chief" was calling him into work on a Friday night. When asked about his cellular phone that was seized incident to arrest, defendant claimed that after his chief called him to come to the

station, an “update” needed to be done to so he “reset” it. When asked, “[s]o your chief called you and then you reset your phone?[,]” defendant nodded in the affirmative.[2]

### 3. Complaint and January 24 Detention Hearing in the Eastern District of New York

On January 23, 2026, a criminal complaint was filed charging defendant with one count of sexual exploitation of a child, in violation of 18 U.S.C. §§ 2251(a) and (e). The following day, defendant appeared in Brooklyn federal court for removal proceedings before the Honorable Marcia M. Henry, United States Magistrate for the Eastern District of New York. *See* Dkt. 20-2 at 1-2. The government, relying on arguments made in their written submissions to the Court (*see* Dkt. 8 at 31-37), moved to detain defendant as a risk of flight and a danger to the community. *See* Dkt. 20-2 at. 10. In substance, the government argued that defendant’s conduct leading up to his arrest and the length of the sentence he was facing demonstrated that he was a flight risk and danger to the community. *See id*. at 11. The government also noted defendant that defendant expressed a sexual interest in multiple child relatives that he had access to. *See id*. at 15-17, 20-21.

Defendant’s prior retained counsel agreed with the Eastern District of New York Probation Office’s assessment that conditions could be set that would reasonably assure defendant’s return to court and ensure the safety of the community. *See id*. at 11-15, 18-22; *see also* Dkt. 10 (E.D.N.Y. PTSR). Counsel argued that defendant had no prior criminal history, no substance abuse history, was a lifelong resident of New York, had been employed by the NCPD, and had a supportive family, as demonstrated by approximately 18 people in court that morning supporting

---

[2] The FBI conducted a forensic examination of defendant’s Android phone seized incident to arrest and confirmed that the phone was wiped.

him. *See id*. at 12. Counsel proposed the following release conditions: a substantial bond secured by one or more family members and two pieces of property; house arrest with electronic monitoring; no use of any internet capable devices; restricting any minors from visiting defendant's home; and posting defendant's residence. *See id*. at 12-16, 18, 20-22.

Citing the "detailed text messages" between defendant and the UC where defendant spoke about "admiring . . . two minor children" that are related to him and that he had access to, the Court was concerned about controlling who had access to defendant and restricting his access to minors. *See id*. at 19-20. Judge Henry ordered defendant detained. *See id*. 22-24; Dkt. 8 at 38. The Court was "extremely concerned about [defendant's] access to children" and explained that this child exploitation case was different because defendant was sending pictures and chatting about known children. Judge Henry concluded that defendant's "proximity to children" supported detention, reasoning that the Court could not "run the risk that [defendant] gains access to children that he knows or doesn't know even with all the additional Adam Walsh conditions. I think that the risk there is too great for those conditions to mitigate it." *See* Dkt. 20-2 at 23-24.

**4. Indictment, Northern District of New York Detention Hearing, and Decision**

On January 28, 2026, a grand jury in the Northern District of New York indicted defendant on one count of attempted sexual exploitation of a minor, in violation of 18 U.S.C. §§ 2251(a) & (e). *See* Dkt. 4. On February 3, 2026, defendant appeared before Magistrate Judge Daniel J. Stewart for his initial appearance. *See* 2/03/26 Text Minute Entry. Regarding detention, Judge Stewart noted, "[t]he EDNY held a detention hearing on 1/24/2026 at which Defendant was detained by US Magistrate Judge Marcia Henry." *Id*.

Defendant filed a motion for bail pursuant to 18 U.S.C. § 3142(f), arguing, *inter alia*, that the defense was proposing additional pretrial release conditions that would address Magistrate

Judge Henry's concern about defendant's access to children. *See generally* Dkts. 20 through 20-21. Defendant recognized the strength of the evidence and he was "facing a serious charge involving a crime against a minor[,]" (Dkt. 20-21 at 6) but argued that despite the weight of the evidence and the nature of the offense, conditions could be set based on the opinion of Dr. Eric Goldsmith ("Dr. Goldsmith"), as well as his "strong family ties, exceptional character, professional accomplishments, and impressive volunteer commitments." *Id*. at 7; *see id*. at 7-15.

The government opposed defendant's motion for bail, arguing, *inter alia*, that no condition or set of conditions would reasonably assure defendant's appearance or protect the community because: (1) defendant's conduct in this case—encouraging the live-streaming of the rape of a 10-year-old child—makes him a clear danger to the community; (2) defendant's admitted sexual interest in two minor relatives, including one 5-year-old girl, and exchanging photos of those children with the UC; (3) the weight of the evidence, including defendant's admissions, is strong and defendant is facing a mandatory minimum of 15 years, with an advisory Guidelines range of 235-293 months;[3] (4) his committing this conduct, and not reporting it, while a sworn member of the police goes to his poor history and characteristics; and (5) his knowledge as a former law enforcement officer would allow him to flee and avoid detection. *See* Dkt. 27 at 1-17. With regard to defendant's proposed release conditions, the government argued that those conditions would not reasonably assure his return to court or the safety of the community because, *inter alia*, his attempt to create a "private jail" would not be feasible for Probation effectively monitor. *See id*. at 17-18.

On May 5, 2026, Magistrate Judge Daniel Stewart held a detention hearing, which he

---

[3] Upon further review, it appears the estimated Guidelines range without acceptance is even higher—292-365 months—because defendant obstructed justice when he wiped his cellular phone immediately before going to the police station. *See* U.S.S.G. § 3C1.1.

characterized as a Renewed Detention Hearing. *See* Dkt. 32 (Det. Order) at 5. The Court noted that while it had no authority to direct the psychiatric examination of a defendant, Dr. Goldsmith's report was sent to Probation, and then to New Paradigm Psychological Services ("New Paradigm") for review. New Paradigm's Brief Risk Assessment, which was "done without the benefit of an interview with Defendant[,]" concluded that defendant was an "average risk of reoffending." *See id*. at 4; Dkt. 38-2. The Court noted that the report found that defendant had "diminished concern for the well-being of the purported minor, [ ] the prioritization of his sexual interests over potential harm . . .[,] a high level of sexual preoccupation, and ongoing sexual focus and escalation." *Id*..

At the Renewed Detention Hearing, Dr. Goldsmith testified consistent with his preliminary (*see* Dkt. 20-3) and final psychiatric report (*see* Dkt. 38-5) of defendant. *See* Dkt. 38-1 at 3-71. In sum, Dr. Goldsmith concluded that defendant "does not evidence characteristics of someone who's a pedophile" (*id*. at 29), that there was "no evidence whatsoever" in the text messages that defendant was "acting in some devious or antisocial way as it relates to being sadistic with a child victim" (*id*. at 31), and that, to a "reasonable degree of medical and psychiatric certainty" defendant, if released under the proposed conditions, would not be a risk to re-offend or be a danger to underage children. *Id*. at 34-35.

On cross-examination, Dr. Goldsmith conceded that he did not review, *inter alia*, the encrypted Wire chats between defendant and the UC,[4] the approximately seven (7) age-regressed

---

[4] At the hearing, these encrypted chats were marked as Government Exhibit 2. Similar to Government Exhibit 1, the 223 pages of FetLife chats between defendant and the UC, the chats were inadvertently not admitted into evidence. *See* Dkt. 38-1 (Index). In making his decision, Judge Stewart reviewed these chats. *See* Dkt. 32 at 5. Therefore, the government respectfully requests that these chats be part of the record for this Court's review and has uploaded these sealed chats to the NDNY MFT portal, along with Dr. Goldsmith's sealed interview notes. *See* Govt. Exh. 3. The defense received copies both in discovery and at the detention hearing. Without

photos of the purported 10-year-old child requested by defendant and sent to him by the UC, the approximately nine (9) photos of two of defendant's minor female relatives, including a 5-year-old child, the photo and video of defendant ejaculating on a photo of the purported 10-year-old child, the audio clip of the purported child engaged in a sex act with her father, the search warrant returns of defendant's Gmail account that he used to communicate with the UC, the video of defendant's post-arrest interview with law enforcement, or any of the other discovery provided by the government no listed in his report. *See* Dkt. 38-1 at 39-41; Dkt. 38-5 at 2. During his examination of defendant, Dr. Goldsmith acknowledged that he did not perform a number of tests to determine defendant's sexual interest in children. In particular, he did not perform a polygraph test to see if defendant was being truthful, the phallometric test, which Dr. Goldsmith explained was a test that measures penal blood flow of a subject when shown images, and the Abel test, which involves showing various images to a subject and seeing how long a person views that image. *See* Dkt. 38-1 at 42-45.

In the Court's Decision and Order, it found three of the four § 3142(g) factors weighed in favor of defendant's continued detention. *See* Dkt. 32 at 8-13. In particular, there was no dispute that the weight of the evidence was strong and the nature and circumstances of the offense weighed "significantly in favor of detention." *Id*. at 10-11. This was due to defendant's attempts to avoid disclosure of his crimes, his agreement to drive to the Albany area, defendant's facilitating the continued sexual abuse of a child and making no effort to stop it, and the fact that defendant's conduct was "much more akin to a contact type offense which, as acknowledged by Dr. Goldsmith,

---

objection, Judge Stewart sealed all three exhibits. *See* Dkt. 38-1 at 37, 48-49, 63. The government respectfully requests that the exhibits remain sealed.

presents a high risk of re-offense." *Id*. Defendant's history and characteristics, including having no criminal history, family support, and ability to post bond and begin sex offender treatment weighed in factor of release. *See id*. at 11. Finally, defendant's danger to the community weighed in favor of detention. The Court noted that Dr. Goldsmith's "opinion that Defendant has not shown an inappropriate interest in children is contradicted by the Defendant's own words and actions[,]" including his "chilling" interest in a young family member "who he was watching from afar." *Id*. at 11. The Court also took issue with Dr. Goldsmith's opinion as to defendant's risk to reoffend, noting that he disagreed with the report's underlying premise that defendant lacked an interest in children. *Id*. at 12. For these reasons, the Court concluded that "the potential danger in this case is simply too high, and that conditions do no exist that would reasonably mitigate those severe risks." *Id*. at 12.

## ARGUMENT

### I. THERE ARE NO CONDITIONS THAT WILL REASONABLY ASSURE THAT DEFENDANT WILL NOT FLEE OR POSE A DANGER TO THE COMMUNITY

### A. Legal Standard

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (cleaned up). The

possibility of a severe sentence is an important factor in assessing flight risk. *See United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018). "A district judge must undertake a *de novo* review of a magistrate judge's decision to release or detain a defendant." *United States v. Terrance*, 2025 WL 782340, at *2 (N.D.N.Y. Jan. 10, 2025). A district court "may rely on the record developed before the magistrate judge or accept additional evidence." *United States v. Oberoi*, 2026 WL 370118, at *4 (N.D.N.Y. Feb. 10, 2026).

**B. Defendant Has Failed to Rebut the Presumption That No Conditions Will Reasonably Assure His Appearance in Court and the Safety of the Community**

Defendant has failed to rebut the presumption that he will not flee or pose a danger to the community if released. *See* 18 U.S.C. § 3142(e)(3)(E); Dkt. 38 at 7. Even if the Court were to find that defendant has rebutted the presumption, for the foregoing reasons, the government has met its burden of establishing both that defendant is a danger to the community and a serious risk of flight.

**Considering the Nature and Circumstances of the Offense, it is Clear that Defendant is a Danger to the Community**

As detailed above and in the criminal complaint, defendant, who at the time of the offense was a law enforcement officer, attempted to sexually exploit a purported 10-year-old girl. Defendant chatted for months with a UC, who repeatedly stated that he was sexually abusing his daughter. Instead of reporting the repeated sexual abuse of a child, defendant encouraged the continued abuse of the child and eventually logged into a live video stream so that he could masturbate to the exploitation of this child. When the child refused to come out of the bedroom to be sexually assaulted by her father, defendant asked about postponing the live stream and requested that the UC send another picture or video of the child to "tease [him] with." The UC sent defendant

another age-regressed photo and defendant sent back a video of him masturbating and ejaculating on the picture of the purported child.

Defendant not only encouraged the ongoing sexual exploitation of the minor, he also financially supported the abuse by sending a prepaid debit card and Amazon gift card information to the UC to purchase children's underwear for the child to wear during her abuse. Defendant also encouraged the UC to purchase a "tiny" butt plug to introduce the child to "ass play." He also discussed his desire to engage in sadomasochistic conduct with the child: wanting the child to urinate on him or for him to urinate on her and shoving a mini baseball bat into her vagina. Moreover, the purported 10-year-old was not the only child defendant was sexually attracted to: he repeatedly talked about his sexual interest in two minor relatives, including a 5-year-old girl. Defendant sent multiple photos of these two minor children to the UC.

In arguing that he does not pose a danger to the community, defendant relies heavily on Dr. Goldsmith's report and New Paradigm's Brief Risk Assessment report. *See* Dkt 38 at 9-12. For the following reasons, Dr. Goldsmith's report is fundamentally flawed and, too, is the New Paradigm report that relied almost exclusively on Dr. Goldsmith's evaluation. *See* Dkt. 32 at 11-12. First, as demonstrated in the government's prior brief (*see* Dkt. 27 at 14-16), during the May 5 detention hearing (*see* Dkt. 38-1 at 37-64, 80-84) and ultimately concluded by Judge Stewart (*see* Dkt. 32 at 11-12), Dr. Goldsmith's opinions about defendant's danger to the community are fatally flawed because they are "contradicted by the Defendant's own words and actions." *See* Dkt. 32 at 11. The report concludes that there is "no identified behavior of [defendant] being sexually aroused by images of underage individuals." Dkt. 38-5 at 2, 7. However, at the hearing, Dr. Goldsmith read chats where defendant, in response to receiving a photo of the purported 10-year-old child, states, "[w]ould i be out of line if I said that I'm a bit aroused by this pick?" Dkt.

38-1 at 54. Defendant also requested photos of the purported child in a "more erotic setting" and offered to show "how much they turn [defendant] on while I look at them." *Id*. at 55. When asked what defendant was referring to, Dr. Goldsmith conceded that defendant was referencing "pictures of the ten-year-old and showing the undercover how aroused he gets." *Id*. Further, after the child refused to come out of her bedroom, defendant sent the UC a video of him masturbating and ejaculating on a photo of the purported 10-year-old child. *See id*. at 40.

Dr. Goldsmith also concluded that defendant "does not receive pleasure from sadistic sexual acts." Dkt. 38-5 at 7. However, at the hearing, Dr. Goldsmith read chats where defendant expressed his desire to have the UC: ejaculate on the child's face or in her mouth, insert a mini baseball bat into the child's vagina, insert a mini butt plug into the child's anus, and urinate on the child or have her drink urine. *See* Dkt. 38-1 at 56-60. Dr. Goldsmith conceded that all of these would constitute sadistic sexual acts. *Id*.

The doctor also opined that "there is no evidence that [defendant's] offending behavior was facilitated by . . . an inappropriate sexual interest in children" and defendant is "not . . . aroused by consensual sexual activity." Dkt. 38-5 at 8. It is difficult to comprehend what would be an "appropriate" sexual interest in children. Also, as Dr. Goldsmith acknowledged at the hearing, any sexual contact between an adult and 10-year-old child would be nonconsensual. *See* Dkt. 38-1 at 53. It strains credulity to argue that defendant's demonstrated interest in masturbating to the live-streamed sexual abuse of a 10-year old girl, desire to travel to abuse that child, and his admitted sexual interest in his minor relatives was "driven by non-paraphilic sexual motivation." *Id*.

Dr. Goldsmith ultimately opined, "to a reasonable degree of psychiatric certainty that [defendant] does not evidence characteristics of someone who's a pedophile. He doesn't have –

there is no evidence of pedophilia." Dkt. 38-1 at 29; *see also* Dkt. 38-5 at 2; Dkt. 38 at 10. At the hearing, Dr. Goldsmith defined "pedophilia" as "deviant sexual arousal to prepubescent children, so an individual evidences sexual arousal and even engages in contact with a . . . prepubescent child." Dkt. 38-1 at 28. However, as discussed above, Dr. Goldsmith read defendant's own words during the hearing in which defendant stated he was aroused by images of the purported 10-year-old and the prospect of watching the child be sexually abused over a live stream, including having sadistic sexual acts performed on her at defendant's request. Thus, by Dr. Goldsmith's own definition, and contrary to defendant's contention (*see* Dkt. 38 at 10), there is ample evidence of defendant's pedophilia.

Second, Dr. Goldsmith did not review the majority of the case materials available to him, including, *inter alia*, defendant's recorded post-arrest interview, the encrypted chats between defendant and the UC, the photographs exchanged—both the age regressed photos of the purported 10-year-old that defendant admitted aroused him and the photos of the defendant's minor relatives that he sent to the UC in exchange for more photos of the 10-year-old—the video of defendant ejaculating on the purported minor's photo that he sent to the UC, the 14-second audio clip of the minor engaged in a sexual act with her purported father, and defendant's Gmail account search warrant returns. *See* Dkt. 38-1 at 38-41. Notably, it appears Dr. Goldsmith did not pay close attention to the few materials he reviewed. In particular, when discussing Government Exhibit 1, the 223 pages of text messages between defendant and the UC, Dr. Goldsmith opined that defendant's chats with the UC "primarily involved consensual kinky sexual fantasies" and that discussion of the purported 10-year-old did not start until approximately half way through the chats, or about 100 pages. *See* Dkt. 38-1 at 51-53. But any cursory review of those chats reveal that the purported 10-year-old was the nearly exclusive focus on each one of those 223 pages.

Also, later in his testimony, Dr. Goldsmith had to concede that defendant's sexual interest in children did not start about 100 pages into the chats, but just six (6) pages in when he asked what kind of "naughty stuff" the UC did with his minor daughter. *See* Dkt. 38-1 at 61-62. In fact, it was only two pages later that defendant volunteered his sexual interest in his 5-year-old relative. *See* Govt. Exh. 1 at USAO-435-36. The doctor also remarkably concluded that defendant did not "place himself in close proximity to prepubescent or underage postpubescent children." Dkt. 38-5 at 8; Dkt. 38-1 at 27, 49-51. However, simply reading defendant's motion and exhibits in support of bail would have clearly demonstrated that defendant *promoted* his proximity to children through coaching youth hockey. *See* Dkt. 20-21 at 10-12. Defendant even included a youth hockey team photo of himself and the 13-14 year old boys he coached—that Dr. Goldsmith admitted never seeing (*see* Dkt. 38-1 at 50) —with the caption "Coach . . . Robert John Sacco." *See* Dkt. 20-4. Dr. Goldsmith acknowledged that coaching youth hockey not only put defendant in proximity to children, but also in the locker rooms with those children when they were getting changed. *See* Dkt. 38-1 at 50-51.

Third, as detailed at the hearing, Dr. Goldsmith failed to perform a number of well-established tests to determine defendant's sexual interest in children and risk of re-offense, including any objective tests that would have not relied solely on defendant's self-serving answers to the doctor's questions. *See* Dkt. 38-1 at 42-45.

Finally, defendant lied to Dr. Goldsmith during his evaluation. Defendant claimed that as an adult, he had no male sexual partners. *See* Dkt. 20-3 at 2; Dkt. 38-5 at 4, 7. At the hearing, Dr. Goldsmith confirmed that his is what defendant told him. *See* Dkt. 38-1 at 45-46. The doctor also confirmed that he told defendant at the beginning of their sessions how important it was to be truthful and conceded that it could be more difficult to make an accurate risk assessment or

diagnosis if the subject was not honest. *See id*. at 38. However, the government proffered, without objection, that contained within defendant's Gmail search warrant returns were multiple videos, apparently taken by defendant, of defendant engaging in unprotected sex with multiple different men. *See id*. at 81-82. This is not surprising since defendant knew that the purpose of Dr. Goldsmith's interview with him was to determine whether defendant could be released pending trial. *See id*. at 37-38; *see* Dkt. 38-5 at 2. Therefore, defendant had every incentive to withhold information from Dr. Goldsmith that he may have viewed as negatively affecting the doctor's ultimate opinion. Had Dr. Goldsmith reviewed the Gmail materials prior these interviews, he would have known that defendant was lying to him.

In summary, Dr. Goldsmith's opinions were deeply flawed because they: 1) were contradicted by defendant's own words and actions; 2) based on incomplete information; 3) were based on incomplete testing; and 4) were based on the uncorroborated word of defendant, an interested party that lied to Dr. Goldsmith about his sexual history. In other words, "garbage in, garbage out." *Cf. United States v. Coriaty*, 300 F.3d 244, 255-56 & n.7 (2d Cir. 2002) (nothing that if invalid data is used to make a decision, the resulting output will also be invalid).

For all the above reasons, the New Paradigm Brief Risk Assessment t is even more flawed. *See* Dkt. 38 at 11-12. The first page includes "Limitations on Assessment[,]" which states that all findings are "provisional and subject to revision" since no direct interview of defendant was conducted and no original notes or raw data form prior evaluations were reviewed. *See* Dkt. 38-2 at 1, 14. The report reviewed even less materials than Dr. Goldsmith (*see id*. at 2), and noted that additional information, including, *inter alia*, a "direct clinical interview" and "more comprehensive background materials [ ] may result in modification of the above risk profile." *Id*. at 1. For this reason alone, no weight should be given to the heavily qualified New Paradigm

report. In any event, even considering the limited, unreliable information that the report relied on, it still found that defendant was an average risk to reoffend. Had the evaluator reviewed all the relevant materials, including, *inter alia*, the chats, photos and videos exchanged, and Gmail search warrant returns, it undoubtedly would have found defendant to be an even higher than average risk to reoffend.

Thus, both the nature and circumstances of the offense and the defendant's clear danger to the community weigh heavily in favor of detention.

**The Weight of the Evidence is Very Strong**

Defendant faces a mandatory minimum sentence of 15 years, with a maximum of 30 years. His estimated advisory Guidelines range, without acceptance, is 292-365 months. The evidence against defendant is very strong. It includes the extensive chats with the UC, the child images exchanged between defendant and the UC (including the multiple images defendant sent of his minor relatives), the "tribute" image and video sent by defendant to the UC, and his post-arrest admissions to FBI. *See* Dkt. 20-21 (Def. Memo.) at 6. Further, defendant exhibited a strong consciousness of guilty by admitting that after he got a call from his police chief, he suspected "something was up" and wiped his cell phone. In fact, defendant had repeatedly wiped his phone in the time leading up to his arrest. *See* Dkt. 38-1 at 82. Thus, this factor weighs heavily in favor of detention.

**Defendant's History and Characteristics**

In his prior submission to Judge Stewart, defendant spent pages talking about his professional accomplishments, volunteer commitments, and "exemplary character[,]" focusing on his time as a member of law enforcement and coordinator of various hockey-related charities and

time spent coaching youth hockey. *See* Dkt. 38 at 9 (citing Dkt. 20-21 at 9-15). However, it is this background, especially his lengthy career as a law enforcement officer, that makes defendant a danger to the community. *Cf. United States v. Ruiz*, 2021 WL 1427804, at *4 (S.D. Tx. Apr. 15, 2021) (upholding the detention of a police officer who sexually assaulted two women while on duty, reasoning that "to commit these types of acts . . he had to disregard and overcome specific legal training in addition to the usual moral and legal constraints against such conduct. It can't be assumed that his future good behavior is in any way assured"). In particular, during the alleged conduct, defendant's attempts to avoid detection were demonstrated by his discussion of using encrypted chats and a VPN. Defendant also told the UC that he would not save anything to his phone to avoid being caught. This conduct continued until the day he was arrested, with defendant admitting that he wiped his cell phone the day he was arrested. Further, contrary to defendant's contention (*see* Dkt. 38 at 14), the fact that defendant was a law enforcement officer while attempting to sexually exploit a child does speak directly to his history and characteristics: someone sworn to uphold the law ignoring for months the "report" button on the bottom right of the FetLife chat profile while he encouraged and financed the sexual abuse of a child. *See* Dkt. 38-1 at 80; *see United States v. Schenberger*, 498 F. Supp. 2d 738, 744-45 (D.N.J. 2007) (rejecting a veteran police officer's request to be released, stating that "defendant was willing to permit this abuse to take place is a window into his character . . . the fact that a trusted police officer engaged in [the distribution of child pornography] is especially egregious. Defendant betrayed his oath of office and the trust placed in him by his family, employer and the community at large. If defendant betrayed this trust, no assurance can be given that he would not also violate any condition of release this Court imposed, no matter how stringent") .

Thus, defendant's history and characteristics weigh in favor of his continued detention.

**Defendant Poses a Serious Risk of Flight**

"[T]he Government must demonstrate that it is more likely than not that that there is a serious *risk* that the defendant will flee, not that it is more likely than not that the defendant *will* flee." *Terrance*, 2025 WL 782340, at *6 (cleaned up) (emphasis in original). Here, the 15 year mandatory minimum sentence for the crime charged, and estimated Guidelines range of 292-365 months, creates a strong incentive for the defendant to flee. *See id*. at *7 (collecting cases that have ordered detention based on serious risk of flight where a defendant, in conjunction with other factors, faced approximately five (5) years imprisonment). Further, it is hard to imagine a defendant more capable of avoiding law enforcement than a former member of law enforcement. *See Schenberger*, 498 F. Supp. 2d at 745 (finding that a police officer charged with distributing child pornography posed a risk of flight "given his knowledge of police practices and procedures").

**Defendant's Proposed Release Conditions Are Unreasonable**

As an initial matter, the undersigned can proffer to the Court that I have spoken with Amy Brancatelli, Senior United States Probation Officer in the Northern District of New York. Senior Officer Brancatelli, who is familiar with this case and was present for the May 5 detention hearing, informs me that Probation recommends that defendant be detained. Probation's general view is that defendant's proposed conditions are unreasonable for Probation to enforce and they do not have sufficient resources to expend on one defendant. With regard to the two conditions that defendant appears to rely most on in support of his release—24/7 cameras at defendant's home and a 24-hour rotation of family members at defendant's home— Senior Officer Brancatelli informed the undersigned that, *inter alia*, Probation does not have the resources to monitor defendant's home and the people coming and going on a full time basis, nor can Probation monitor

what internet capable devices those family members and others are brining into defendant's home. *See United States v. Valerio*, 9 F. Supp. 3d 283, 292 (E.D.N.Y. 2014) ("by the click of a computer key or tap of a touchscreen on a mobile phone, defendant could cause the same type of extreme harm to children and the community that he is alleged to have committed in the instant offense"); *see id*. at 292-96 (rejecting defendant's attempt at creating a "private jail" to prevent any access to minors or unapproved visitors using, *inter alia*, 24/7 private security guards at his residence because of the "expenses and diversion of government resources . . . to implement and ensure continuing compliance with these efforts").

Contrary to defendant's contention (*see* Dkt. 38 at 14), defendant has already demonstrated his ability to hide his crimes from his friends and family and there is every reason to believe he would be able to continue to get away with such behavior if released. *See* Dkt. 32 at 12. As defendant's own wife told Dr. Goldsmith, defendant's "judgment when horny is similar to his judgment when drunk." Dkt. 38-1 at 48; Govt. Exh. 3. Thus, Judge Stewart's rejection of defendant's proposed conditions as impractical is clearly supported by the record and defendant's arguments to the contrary are without merit. *See* Dkt. 32 at 12-13; Dkt. 38 at 13-14.

**Magistrate Judge Stewart's Detention Order Was Amply Supported by the Evidence Adduced Below**

Defendant contends that Judge Stewart's detention order was "not supported by any of the evidence presented at the Renewed Detention Hearing." Dkt. 38 at 12-15. For the reasons discussed above, defendant's objections are wholly without merit. Defendant claims that characterizing his conduct as a "contact type offense" was inappropriate and that defendant never communicated with a minor or took any affirmative steps to travel. *See* Dkt. 38 at 12. In response to Judge Stewart's questions, Dr. Goldsmith stated that if an individual were to "take actions to

engage in some meet-up, that would be considered a contact sexual act." Dkt. 38-1 at 69. Dr. Goldsmith also agreed that during the chats, defendant attempted to meet with the purported 10-year-old child. *See* Dkt. 38-1 at 24. His conclusion is supported by the chats. For example, defendant discussed planning a "golf trip" upstate with "the boys" and then would "take a little detour or something" to meet up with the child. *See* Govt. Exh. 1 at USAO-528. He also volunteered to pay for a hotel in New York City for the purported father and child so that they could "play" with "dads friend." *See id*. at 528-30. Regardless, defendant is currently charged with using a computer to attempt to sexually exploit a child, not travel to engage in sex with a minor. As both the government and Judge Stewart have observed, logging onto a live web stream to watch the real time abuse of a child is becoming the modern version of showing up at a motel. *See* Dkt. 32 at 11; Dkt. 38-1 at 81, 86. Moreover, the law makes no distinction whether defendant himself attempted to sexually exploit the child or whether he directed a third party to assault the child while he watched live on the internet. *See United States v. Naim*, 2015 WL 3440253, at *19-21 (E.D.N.Y. May 20, 2015), *aff'd,* 710 F. App'x 12 (2d Cir. Oct. 10, 2017) (summary order); *cf. United States v. Douglass*, 626 F.3d 161 (2d Cir. 2010). Moreover, defendant attempted to contact the purported child through her father when he repeatedly asked the UC to show the 10-year-old child a picture of defendant's penis. *See*, *e.g.*, Govt. Exh. 1 at USAO-500 ("When will you show [redacted] my pic? It's all I can think about now"); USAO-507 ("Are you showing her my pic today?"); USAO-550 ("Did she see the pic? ;)").

Lastly, contrary to defendant's contention (*see* Dkt. 38 at 15), neither the government nor Judge Stewart suggested that defendant's family had informed him about his pending arrest and caused him to wipe his cell phone. *See* Dkt. 32 at 12 (the "they" that Judge Stewart is referring to is clearly "the local police department"); Dkt. 38-1 at 82. It is clear from defendant's own

statement that he wiped the phone because felt "something was up" when his local police chief called him into the office that day. *See* Dkt. 38-1 at 82.

**CONCLUSION**

For the foregoing reasons, defendant's appeal of Judge Stewart's detention order should be denied without a hearing and defendant should remain detained pending the resolution of this case.

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

JOHN A. SARCONE III
First Assistant United States Attorney

By: /s/ *Allen J. Vickey*
Allen J. Vickey
Assistant United States Attorney
Bar Roll No. 513696