**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

     **vs.**

**ROBERT SACCO,**

                    **Defendant.**

                             **1:26-CR-31**
                             **(MAD)**

---

**APPEARANCES:**

**OF COUNSEL:**

**OFFICE OF THE UNITED STATES ATTORNEY**
445 Broadway
Room 218
Albany, New York 12207
Attorney for the Government

**ALLEN J. VICKEY, AUSA**

**GOTTLIEB TOWNSEND**
111 Broadway - Suite 701
New York, New York 10006
Attorneys for Defendant

**ROBERT GOTTLIEB, ESQ.**
**KAYLEE KREITENBURG, ESQ.**
**PAUL TOWNSEND, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On January 23, 2026, Defendant Robert Sacco was charged in a criminal complaint with one count of attempted sexual exploitation of a child in violation of 18 U.S.C. § 2251(a) and (e). *See* Dkt. No. 1. Defendant was arrested the next day. A detention hearing was held on the day of

1

Defendant's arrest in the Eastern District of New York.  *See* Dkt. No. 20-2.  Magistrate Judge Marcia Henry ordered Defendant to be detained.  *See id.*

An indictment was returned on January 28, 2026, charging Defendant with the same offense.  *See* Dkt. No. 4.  Defendant was arraigned on that charge in the Northern District of New York before Magistrate Judge Daniel J. Stewart on February 3, 2026.  Magistrate Judge Stewart ordered Defendant to be remanded to the custody of the United States Marshal.  *See id.*

On March 26, 2026, Defendant filed a motion for bond.  *See* Dkt. No. 20.  The Government opposed the motion.  *See* Dkt. No. 27.  Magistrate Judge Stewart held a renewed detention hearing on May 18, 2026.  That same day, Magistrate Judge Stewart issued a written decision denying the motion for bond.  *See* Dkt. No. 32.

Presently before the Court is Defendant's appeal of that detention Order.  *See* Dkt. No. 38. The Government opposes the appeal.  *See* Dkt. Nos. 41, 42.  For the following reasons, Magistrate Judge Stewart's detention decision is affirmed.

## II. BACKGROUND

The factual allegations are derived from the affidavit of Colonie Police Department Investigator/Federal Bureau of Investigation Task Force Officer Christopher Smith, which was submitted in conjunction with the criminal complaint.  *See* Dkt. No. 1 at 3.  On or about October 22, 2025, Officer Smith was acting in an undercover capacity as a father of a fictitious 10-year-old daughter on a social networking site.  *See id.* at 4.  Defendant allegedly contacted Officer Smith "expressing interest in chatting about nudism in the home" based on Officer Smith's profile which indicated an interest in "talking kink and taboo with people and have very little

limitations." *Id.* For the next few days. Defendant and Officer Smith engaged in conversations about Officer Smith's fictitious 10-year-old daughter. *See id.* Officer Smith attested that Defendant "also expressed interest in a 5 year old minor female." *Id.* at 5. Specifically, while messaging, Officer Smith asked, "Do many people know about this side of you?" *Id.* Defendant responded, "Only a couple people know I feel the same about [REDACTED] but she's a little younger than your daughter." *Id.* Defendant then expressed an interest to travel to the Albany area to be near the 10-year old, asked about exchanging photos of the 10-year-old and 5-year-old, engaged in sexually explicit conversations about what had been done to the 10-year-old by her "father" and what the Defendant would like to do with her, and sent a prepaid debit card number and photos of clothes for Officer Smith to buy for the 10-year-old to wear in videos of her engaging in sexually explicit conduct. *See id.* at 5-22. Based on these allegations, an arrest warrant was issued for Defendant.

During the first detention hearing in the Eastern District of New York, Defendant's attorney argued that despite "the nature and severity of the charges," there were conditions that would ensure Defendant's safety in the community and return to court. Dkt. No. 20-2 at 13. Defendant's counsel noted that Defendant is a lifelong New York resident, he was employed as a Nassau County Police Officer for ten years, he has never been arrested, and he has no substance abuse problems. *See id.* The attorney also noted that Defendant has immense support in the community, demonstrated by the approximately eighteen people who appeared at the proceeding to support Defendant, including his wife. *See id.* Defense counsel affirmed that Defendant's family and friends were willing to put forward a substantial financial bond to secure Defendant's

3

release. *See id.* at 13-14. The attorney also suggested that Defendant could be placed on house arrest with electronic monitoring and a restriction on his access to the internet. *See id.* at 16. The Government then stated its concerns about Defendant's access to children, particularly family members, as well as firearms. *See id.* at 17. The Government also noted the strength of the evidence against Defendant. *See id.* at 17-18.

The court heard an oral report from pre-trial services. That portion of the transcript was sealed. *See id.* at 18-19. Defense counsel explained that Defendant's firearms had been seized and the court could impose a condition restricting people from being able to come to Defendant's home. *See id.* at 19. The court stated as follows:

> In this case there appear to be in the very detailed text messages that were exchanged between a person identified as Mr. Sacco and the undercover officer that he did in fact have access to and had been admiring, I put that in quotes, two minor children that are related to him. My concern there is that yes, there can be certainly control over where Mr. Sacco is located if he were released because he'd be required to remain in his home at all times. But the Court's ability to control who's around Mr. Sacco or any of these minors to which he is related or any other children is unclear. . . .
>
> [T]here is a statutory rebuttable presumption, in some ways, . . . I believe that the presumption has been rebutted based on some of the information that you have provided regarding Mr. Sacco's familial connection, his stability in the community, his steady employment until most recently and the like. If I rely, however, on the remaining statutory factors, I'm extremely concerned about Mr. Sacco's access to children. . . .
>
> I can't run the risk that somehow Mr. Sacco gains access to children that he knows or doesn't know even with all of the additional Adam Walsh conditions. I think that the risk there is too great for those conditions to mitigate it. And for those reasons I am

4

going to order that he be detained and transported in custody to the
Northern District of New York.

*Id.* at 20, 24-25.

Two days after the hearing, the Probation Department issued a written pretrial services report. *See* Dkt. No. 10. The Probation Department recommended that Defendant be released on a moderate unsecured bond cosigned by family sureties. *See id.* at 4. The proposed conditions included, among other things, home detention, electronic monitoring, an internet restriction, and a no contact with minors restriction. *See id.*

On May 5, 2026, Magistrate Judge Stewart held the renewed detention hearing. *See* Dkt. No. 37. Defense counsel presented testimony from Eric Goldsmith, M.D., a forensic psychiatrist. *See id.* at 3-4. Dr. Goldsmith testified that he interviewed Defendant three times, interviewed Defendant's wife, and reviewed the complaint, the Probation report, and Defendant's internet messages. *See id.* at 19. Dr. Goldsmith described Defendant's upbringing and life, which included adolescent sexual encounters which resulted in Defendant developing "voyeuristic sexual behaviors." *Id.* at 22. He testified that Defendant did not "put himself historically in situations where he was around children" and "did not evidence any inappropriate behaviors when he was around children." *Id.* at 27. Dr. Goldsmith stated that Defendant's characteristics demonstrated "that he was not driven to kind of engage himself with children for the purposes of getting in close proximity and eventually having some sexual contact." *Id.* Dr. Goldsmith opined "to a reasonable degree of medical certainty that [Defendant] does not evidence characteristics of someone who's a pedophile. He doesn't have – there is no evidence of pedophilia." *Id.* at 29. Dr. Goldsmith also stated that Defendant "evidences the type of paraphilic condition, a post-traumatic

disorder condition, which is highly treatable." *Id.* at 31.  Dr. Goldsmith explained that he arranged sex offender treatment for Defendant should he be released and that Defendant was not at risk to re-offend and was not a risk of danger to underage children.  *See id.* at 32-37.

On cross examination, Dr. Goldsmith testified that he had not reviewed any of the photos that had been sent between Defendant and undercover officer.  *See id.* at 39-40.  He also did not "review the approximately 14-second audio clip of the ten-year-old child purportedly engaged in a sex act with her father." *Id.* at 40.  The Government then questioned Dr. Goldsmith about several psychological tests, confirming that Dr. Goldsmith did not conduct them, including the phallometric test for offenders, the Affinity Sexual Interest Viewing Time test, the Abel and Becker Card Sort, a polygraph, the LOOK Assessment, the Hypersexuality Behavior Inventory, the Static99-r Risk Assessment, and the Dynamic Risk Assessment or STABLE-2007.  *See id.* at 42-45.  Dr. Goldsmith also confirmed that Defendant and his wife's couples sex therapy resulted in only "temporar[y] improvements. *Id.* at 47.  The Government noted through its questions that Dr. Goldsmith was unaware of Defendant's volunteer work with youth hockey.  *See id.* at 49-51.  Dr. Goldsmith agreed that his report included the opinion that Defendant "does not receive pleasure from inflicting pain on others or causing suffering," but then agreed that several of the sexual acts Defendant discussed in his messages with the agent would constitute sadistic sexual acts.  *See id.* at 56-59.  Dr. Goldsmith opined that Defendant was a low risk of re-offending and noted that a New Paradigm Psychological Services ("New Paradigm") report, which Defendant introduced as evidence, considered Defendant to be an average risk.  *See id.* at 68.

Defendant's attorney noted that New Paradigm did conduct the Static-99r and STABLE-2007 tests.  *See id.* at 71-72.  Counsel stated that Defendant had only one of the ten risk factors identified in the Static-99r and that the STABLE-2007 "only found some problem on two of the risk factors, significant social influences and deviant sexual interest.  The only factor which it found to be a definite problem was the sex drive or sexual preoccupation." *Id.* at 72.  Counsel noted that Dr. Goldsmith "addressed" Defendant's "sex drive" in his opinion and "didn't minimize that." *Id.*

In the Government's closing argument, it reiterated that Defendant "logged into an encrypted Wire chat where they talked for weeks about what sexual abuse was going to happen to a ten-year-old girl." *Id.* at 80.  The Government noted that Defendant "knew for three months – he believed for three months that a ten-year-old was being sexually abused and doesn't report it." *Id.*  Counsel stated "[t]hat in and of itself is horrible for anything.  But this was a sworn member of law enforcement.  If anyone is going to know better than anyone else to do something about the sexual abuse of a child, whether it's his fantasy or something, it was the [D]efendant." *Id.*  The Government explained that "for three months he did not nothing.  And not only did he do nothing, he encouraged it." *Id.*  The Government also asserted that Dr. Goldsmith's opinion was unreliable because he relied primarily on the Defendant's word but Defendant lied.  *See id.* at 81-82.  The Government stated that Defendant denied having any male sexual partners to Dr. Goldsmith, but "[i]n his Google search form that was provided to the defense over a month and a half ago, there are multiple videos of the defendant engaging in unprotected sex with multiple different males."

*Id.* at 81-82.  The Government emphasized that "[D]efendant wiped his phone" after being "told by his chief" to come into work for an interview.  *Id.* at 82.

Magistrate Judge Stewart then issued an oral decision, finding that Defendant poses a significant danger to the community and that there are no conditions he could impose that would ameliorate that risk.  *See id.* at 87.  Specifically, Magistrate Judge Stewart noted that because of the offense charged, there is a presumption of detention and a mandatory minimum term of imprisonment of fifteen years if Defendant is found guilty.  *See id.* at 85.  Magistrate Judge Stewart noted the escalation in Defendant's behavior from engaging in certain sexual conduct with his wife and then turning to online platforms after couples therapy was unsuccessful.  *See id.* at 86.  He then "agree[d] with the [G]overnment that in this day and age, online activity is the functional equivalent of a contact offense, especially with videos."  *Id.*  Magistrate Judge Stewart was "struck by the fact that . . . this is a police officer chatting with someone who he thinks is the father of a ten-year-old who he's sexually abusing, and he makes no effort to do anything about it and, in fact, he gets some sexual enjoyment from this."  *Id.* at 86-87.  He also noted a concern about Defendant wiping his phone.  *See id.* at 87.

Magistrate Judge Stewart's written decision reiterated the same.  *See* Dkt. No. 32. Magistrate Judge Stewart stated that Defendant's alleged "conduct [] does not involve simply viewing images or engaging in 'kinky' sex chat," but was "designed to be protected by disclosure by using encrypted communication, [and] involved the discussion of abusing and raping a ten-year-old child."  *Id.* at 10-11.  Magistrate Judge Stewart explained as follows:

> Most disturbingly, he engaged in a series of discussions with the
> father about abusing his child, and listened to an audio recording of

the abuse, but made no attempt to fulfill his oath as a police officer to report or in any way stop this conduct. Rather, to the contrary, he encouraged it and actively attempted to participate in it. The Court believes that this is much more akin to a contact type offense which, as acknowledged by Dr. Goldsmith, presents a high risk of re-offense.

*Id.* at 11. Magistrate Judge Stewart acknowledged that Defendant does not have a criminal history, has substantial community support, and would be able to obtain sex offender treatment is released. *See id.* However, Magistrate Judge Stewart noted that Defendant's "interest in a young family member, who he was watching from afar, is chilling in light of the Defendant's expressed desire to engage in nonconsensual and/or sadistic conduct. This Court is also concerned about the Defendant's potential access to online forums to participate in, or direct, abuse of minors." *Id.* at 11-12. As to a proposed condition that no individuals under the age of eighteen would be allowed to enter Defendant's home, Magistrate Judge Stewart noted that "the Probation Department does not have the facilities to assure that in fact occurs" and "Defendant engaged in the charged conduct while living with his devoted and attentive wife, so his ability to hide his conduct is well established." *Id.*

On appeal, Defendant challenges Magistrate Judge Stewart's conclusion that he is a danger to the community. *See* Dkt. No. 38 at 9. Defendant emphasizes that "[b]oth experts unanimously determined that [he] is not a danger to the community if he were to be released with any form of supervision." *Id.* Defendant also contends that "Magistrate Judge Stewart attempted to equate [Defendant's] charged conduct to a 'contact type offense[]'" and argued that "such a determination inappropriately penalizes [him] for conduct that never occurred." *Id.* at 12. Defendant "also respectfully reject[s] any contention by the Government that because [Defendant] is a former law

9

enforcement officer[, this] renders his alleged criminal conduct more serious.  The fact that [Defendant] is former member of law enforcement has no connection to the criminal conduct charged in the Indictment."  *Id.* at 14.

The Government argues that Defendant's appeal should be denied because Defendant has failed to rebut the presumption that he is a risk of flight and danger to the community.  *See* Dkt. No. 41 at 16.  The Government contends the psychological assessments from New Paradigm and Dr. Goldsmith are flawed and do not support release.  *See id.* at 21-22.  The Government also asserts that all of the factors the Court must consider weigh in favor of detention. *See id.* at 16-23. Finally, the Government proffers that the Probation Department recommends that Defendant remain detained because "[D]efendant's proposed conditions are unreasonable for Probation to enforce and they do not have sufficient resources to expend on one defendant."  *Id.*  at 24.

## II. DISCUSSION

### A.  Standard of Review

Where, as here, a detention hearing is authorized, the Court must consider whether any condition or combination of conditions will reasonably assure the defendant's appearance at trial and the safety of the community, applying the factors set forth in 18 U.S.C. § 3142(g).  *See United States v. Berrios-Berrios*, 791 F.2d 246, 249 (2d Cir. 1986).  If the Court finds that a condition or combination of conditions will reasonably assure the defendant's appearance at trial and the safety of the community, the defendant must be released.  If not, the defendant must be detained.  *See* 18 U.S.C. § 3142(c).  If a magistrate judge orders a defendant released on conditions, the Government may file with the district court "a motion for revocation or

10

amendment of the order," which must be "promptly determined." 18 U.S.C. § 3145(b). The

district court then conducts a de novo review, *United States v. Leon*, 766 F.2d 77, 80 (2d Cir.

1985), in which it may rely on the record developed before the magistrate judge or accept

additional evidence. *See United States v. Colombo*, 777 F.2d 96, 98 n.1 (2d Cir. 1985).

When detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists

four factors to be considered in the detention analysis: (1) the nature and circumstances of the

crime charged, (2) the history and characteristics of the defendant, (3) the seriousness of the

danger posed by the defendant's release, and (4) the weight of the evidence against the defendant.

*See* 18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings, and the Government is entitled to

present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also*

*United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000). This is because "bail hearings

are 'typically informal affairs, not substitutes for trial or even for discovery.'" *LaFontaine*, 210

F.3d at 131 (quotation and other citation omitted). Nevertheless, the Second Circuit "has also

recognized that while the informality of bail hearings serves the demands of speed, the magistrate

or district judge must also ensure the reliability of the evidence, 'by selectively insisting upon the

production of the underlying evidence or evidentiary sources where their accuracy is in question.'"

*Id.* (quotation and other citation omitted).

### B. Application

In the present matter, the Court finds that the factors weigh in favor of Defendant's

continued detention.

As an initial matter, "[s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense involving a minor victim under section . . . 2251 . . . of this title."  18 U.S.C. § 3142(e)(3)(E).  Here, Defendant has been charged with attempted sexual exploitation of a minor in violation of 18 U.S.C. § 2251(a) and (e).  *See* Dkt. No. 4.  However, the "minor victim" is fictitious.  *See* Dkt. No. 1.  The Court is not aware of a circuit court that has addressed whether the detention presumption applies in a case where the allegations concern a fictitious minor victim that the defendant believed to be a real child.  However, district courts have applied the presumption in such circumstances.  *See United States v. Phillips*, No. 3:06-CR-47, 2009 WL 10711323, *3 (N.D.W. Va. Jan. 30, 2009) ("[T]his [c]ourt is of the opinion that rebuttable presumption found in Section 3242(e) applies in situations where the 'minor victim' is actually a fictitious minor"); *United States v. Hite*, 76 F. Supp. 3d 33, 37 (D.D.C. 2014), *aff'd*, 598 Fed. Appx. 1 (D.C. Cir. 2015) (applying the presumption where the allegations concerned "a crime that involves minor, albeit in this case fictitious, victims"); *United States v. Cutter*, 637 F. Supp. 2d 348, 351 (W.D.N.C. 2009) (applying the presumption where "there was not an actual 11-year-old girl in this case").

Here, Defendant does not dispute application of the presumption.  *See* Dkt. No. 38.  If the presumption does apply, "[t]he defendant 'bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight.'"  *United States v. Kelly*, No. 20-1720, 2020 WL

7019289, *1 (2d Cir. Sept. 8, 2020) (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)). "Once the burden of production is met, the presumption 'does not disappear entirely,' but rather 'remains a factor to be considered among those weighed by the district court.'" *Id.* "Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *Id.* (citation and quotation marks omitted); *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991).

Regardless of the applicability of the presumption, the Court finds by clear and convincing evidence that Defendant presents a danger to the community.

### 1. Nature and Circumstances of the Offense

Under 18 U.S.C. § 3142(g)(1), courts are to consider "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." Here, the nature and circumstances of this offense support detention.

Defendant argues Magistrate Judge Stewart improperly equated the conduct underlying the sexual exploitation charge with hands-on child pornography offenses. *See* Dkt. No. 38 at 12. At this time, the evidence reflects only online communications. There is currently no evidence that an actual child was harmed.

However, the Second Circuit has affirmed a defendant's conviction for attempted sexual exploitation of a child where the evidence established that the defendant "knew that [the person he

13

was communicating with online] filmed the boys himself, using a fictitious female persona."
*United States v. Naim*, No. 13-CR-660, 2015 WL 3440253, *16 (E.D.N.Y. May 20, 2015), *aff'd*, 710 Fed. Appx. 12 (2d Cir. 2017).  "Indeed, over the course of their communications, [the defendant] repeatedly expressed his approval and appreciation for [the other individual's] methods.  [The defendant] also knew that [the other person] had no additional, pre-recorded videos of [the minor victim] that [the defendant] had not yet seen."  *Id.*  The district court stated that "to prove [the defendant's] guilt on [the attempted sexual exploitation charge], the Government was required to prove that [the defendant] intended to 'use[ ], employ[ ], persuade[ ], induce[ ], entice[ ], or coerce[ ]' John Doe to 'take part in sexually explicit conduct for the purpose of producing any visual depiction of that conduct.'"  *Id.* (citation omitted).  The district "court conclude[d] that a defendant can violate the statute solely through communications with an adult intermediary[.]"  *Id.* at *19 (collecting circuit court cases holding that a defendant may be convicted for certain child sex offenses solely on the basis of communications with an adult).

Here, the Government's evidence includes messages between Defendant and the law enforcement agent in which Defendant is discussing when he and the agent can join a live video call so that Defendant can masturbate while the agent sexually abuses the fictitious 10-year-old child.  *See* Dkt. No. 42.  Defendant joined the video call on the day it was planned for but "the [fictitious] child refused to come out" of her bedroom.  Dkt. No. 1 at ¶ 35.  Defendant not only knew about, but requested to watch live, a child whom he believed to be real, being sexually exploited.  The fact that Defendant was not the individual who would be physically harming the fictitious child does not diminish the seriousness of the charged offense.

"In Considering the PROTECT ACT of 2003, the House Conference Report discussed [that c]ourts 'all too frequently impose sentences more lenient than those prescribed by the sentencing guidelines in cases under chapter 117, particularly in situations where an undercover agent rather than a child was the object of the enticement.  Yet the offender's conduct in such a case reflects a real attempt to engage in sexual abuse of a child, and the fact that the target of the effort turned out to be an undercover officer has no bearing on the culpability of the offender, or on the danger he presents to children if not adequately restrained and deterred by criminal punishment.'" *United States v. Fitzhugh*, No. 16-MJ-30364, 2016 WL 4727480, *4 (E.D. Mich. Sept. 12, 2016) (quoting H.R.Rep. No. 108-66 ).  "These statements reflect Congress's view that conduct aimed at fictitious but intended minors poses the same level of danger to the community, a primary consideration of the Bail Reform Act." *United States v. Kirkpatrick*, No. 23-CR-40020, 2023 WL 4846620, *10 (D. Kan. July 28, 2023).

Finally, Defendant faces a fifteen-year mandatory minimum prison sentence if convicted of the charged offense.  *See* Dkt. No. 41 at 22; Dkt. No. 38 at 8-9.  "The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence." *United States v. Zhang*, 55 F.4th 141, 151 (2d Cir. 2022) (citing *United States v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007)); *see also United States v. English*, 629 F.3d 311, 317, 322 (2d Cir. 2011) ("A 20-year mandatory minimum sentence . . . overcomes virtually any tie to the community and gives [the defendant] an extraordinary incentive to flee"); *United States v. Andrews*, No. 19-CR-131, 2020 WL 3182911, *1 (S.D.N.Y. June 15, 2020).

Therefore, although the underlying charge involves an attempted offense concerning what Defendant now knows to be a fictitious child, he believed the child to be real at the time of the offense. This factor weighs in favor of his continued detention.

### 2. Weight of the Evidence

The weight of the evidence also favors detention. "'In assessing the weight of the evidence against a defendant, it is important to note that the defendant is presumed innocent, and it is not the Court's role at this stage of the proceedings to assess [the defendant's] guilt or innocence.'" *United States v. Dai*, No. 3:23-CR-478, 2023 WL 11016392, *7 (N.D.N.Y. Dec. 19, 2023), *aff'd*, 99 F.4th 136 (2d Cir. 2024) (quoting *United States v. Mendez*, No. 19-CR-245, 2020 WL 3263446, *4 (W.D.N.Y. June 17, 2020)) (cleaned up) (additional citation and quotation marks omitted); *see also United States v. Epstein*, 425 F. Supp. 3d 306, 321 (S.D.N.Y. 2019)).

The Government's proffered evidence "includes the extensive chats with the [undercover law enforcement agent], the child images exchanged between defendant and the UC (including the multiple images defendant sent of his minor relatives), the 'tribute' image and video sent by defendant to the [agent], and his post-arrest admissions to FBI." Dkt. No. 41 at 22. This is strong evidence of knowingly attempting to sexually exploit a minor.

The Court also finds that Defendant's act of resetting his phone shortly after his police chief asked him to come into work supports an inference of a guilty mind. Defendant argues "[t]here has been no evidence presented by the Government to support this contention other than baseless speculative argument. To credit such an accusation without any support would be an injustice." Dkt. No. 38 at 15.

The Government proffers that during Defendant's interview with the FBI after his arrest, he "stated that 'had a feeling something was up' since his [police] 'chief' was calling him into work on a Friday night." Dkt. No. 41 at 9. The Government contends that "When [Defendant was] asked about his cellular phone that was seized incident to arrest, defendant claimed that after his chief called him to come to the station, an 'update' needed to be done to so he 'reset' it. When asked, '[s]o your chief called you and then you reset your phone?[,]' defendant nodded in the affirmative." *Id.* at 9-10. The Government also avers that "[t]he FBI conducted a forensic examination of [D]efendant's Android phone seized incident to arrest and confirmed that the phone was wiped." *Id.* at 10 n.2.

Defendant does not dispute this order of events or that he made such statements or movements during the FBI interview.

Additionally, the messages between Defendant and the agent included messages from Defendant about using encrypted software and being nervous about getting caught. For example, Defendant asked the undercover officer about using Telegram instead of Whatsapp because Whatsapp is "linked to [his] phone number." Dkt. No. 42 at 11. Defendant said, "Wire I have on my burner phone . . . " *Id.* at 11-12. Defendant asked the agent, "Do you ever use a VPN when chatting about such naughty things? Every [sic] worry about privacy? Once in a while I get nervous seeing videos about people getting caught." *Id.* at 167. The agent stated that he used a VPN and "[i]t puts my ip in like Indiana or some shit like that." *Id.* Defendant said, "Haha nice! I do the same [laughing emoji] figured it would come in handy at one point." *Id.* A few days later, Defendant said, "Idk if its just me but I have been seeing a lot of news articles about guys

getting caught with inappropriate stuff on their phone and I've been kinda worried." *Id.* at 205. He said, "Wire I use the VPN so that makes me feel better too. Plus I never save anything to phone." *Id.* Defendant then stated, "I feel like all the news things are signs I should stop but I don't wanna haha I think I'll jut stick with chatting with you :) all I need." *Id.*

Defendant's attempt to reject the assertion that wiping his phone demonstrates a guilty mind completely ignores his own words and conduct. *See United States v. Berg*, No. 22-CR-10088, 2022 WL 17403167, *4 (D. Kan. Dec. 2, 2022) ("[The d]efendant's efforts to destroy and hide evidence and to otherwise thwart detection by his technical sophistication give the court pause as to whether any conditions could be imposed which could assure that [the d]efendant would not continue this behavior on release. . . . Tellingly, [the d]efendant knew in advance that law enforcement had obtained a search warrant for [the d]efendant's Dropbox account and the evidence suggests that [the d]efendant attempted to hide physical evidence (the external storage devices) and to wipe or erase forensic evidence on his devices").

In sum, this factor weighs in favor of detention. Although Defendant is charged with attempted sexual exploitation and not the possession or distribution of child pornography, the existence of the online messages between Defendant and the undercover officer combined with the act of wiping his cell phone constitute evidence of his guilt. *See, e.g.*, *United States v. Grooms*, No. 22-CR-128, 2022 WL 1204861, *4 (N.D. Ill. Apr. 22, 2022) ("The evidence here consists of victim statements, text messages, recorded conversations, undercover agent communications with [the defendant], [the defendant]'s own statements, as well as scores of child pornography photos and videos contained in multiple electronic media belonging to [the

defendant] and online accounts attributable to [the defendant].  All of this evidence demonstrates that the weight of the evidence is strong and demonstrates that his release poses a risk of danger to the community"); *United States v. Garner*, No. 24-CR-533, 2025 WL 1575848, *4 (D.D.C. Mar. 11, 2025) ("The weight of the Government's evidence against [the d]efendant is considerable.  The Government's case is supported by messages [the d]efendant exchanged with the UC over Kik, tracing the Kik messages to [the d]efendant's IP address . . ., Defendant's email address registered to one of the Kik accounts, Defendant's attempt to obstruct the investigation by tossing his iPhone off a balcony and claiming it was stolen when New Jersey state authorities executed a search warrant at his apartment, and the physical evidence discovered on [the d]efendant's (recovered) iPhone and laptop"); *United States v. Blanchard*, No. 18-MJ-101, 2018 WL 4964505, *5 (D.D.C. Oct. 15, 2018) ("The weight of the government's evidence against [the] defendant is very strong.  The government supports the child pornography distribution charge with the defendant's own communications with an undercover officer, the child pornography videos and images the defendant sent directly to the UC and also uploaded to a[] KIK chat group with the provocative name 'Pedos Only,' as well as the defendant's invitations to online KIK users to join the 'Pedos Only' group").

### 3. Defendant's History and Characteristics

Among other things, this factor asks the Court to consider "the person's character, physical and mental condition, family ties, employment, . . . past conduct, history relating to drug or alcohol abuse, [and] criminal history." 18 U.S.C. § 3142(g)(3).

Defendant's history and characteristics cuts both ways. The parties agree that Defendant does not have a criminal history. Defendant also has significant ties to New York and family support as demonstrated by individuals' willingness to post a personal recognizance bond of $1,000,000. *See* Dkt. No. 38 at 3, 9. However, as indicated in the pretrial services report, Defendant has been a police officer with the Nassau County Police Department since 2016 and, prior to his arrest, held the rank of detective. *See* Dkt. No. 10 at 2. Defendant argues that "[t]he fact that Mr. Sacco is former member of law enforcement has no connection to the criminal conduct charged in the Indictment." Dkt. No. 38 at 14. It is true that there are no allegations that Defendant used his position as a police officer to assist him in engaging in the underlying conduct; however, the Court considers his job as evidence of his character.

Defendant swore an oath to defend and protect his community from harm. Rather than uphold that oath, the allegations accuse him of now being among those who commit some of the most egregious harm imaginable against the most innocent population—children. The Court cannot overlook the alleged dereliction of his duty when determining whether Defendant's character represents that of a person who is a danger to his community. *See United States v. Alston*, 899 F.3d 135, 151 (2d Cir. 2018) ("And, from the perspective of society [at] large, a police officer indisputably holds a 'position of trust' when it comes to detecting and preventing drug crime. . . . Society is victimized in a particularly malign way when a police officer aids crime instead of stopping it"); *United States v. Crish*, No. 3:18-CR-0304, 2024 WL 1141614, *2 (N.D. Ohio Mar. 15, 2024), *aff'd*, No. 24-3241, 2025 WL 884091 (6th Cir. Feb. 4, 2025) (denying motion for sentence reduction where the defendant was a law enforcement officer because "[t]he

20

officer who breaks the law, rather than enforcing it, deserves severe punishment. That is what the public expects and what the Defendant should justly receive. To do otherwise would diminish, rather than enhance, respect for the law").

On the whole, however, this factor falls on both sides of the line.

### 4. Danger Posed by Defendant's Release

Defendant relies heavily on the reports from Dr. Goldsmith and New Paradigm to argue that he is not at risk of re-offending and is therefore not a danger to the community. *See* Dkt. No. 38. Defendant correctly reiterates both opinions, which concluded that Defendant "is not at risk to reoffend while released to home; certainly not at risk to be a danger to underage children" and he "could be safely managed and treated effectively if mandatory to any form or level of community supervision." *Id.* at 2 (citations omitted).

The Government argues that "Dr. Goldsmith's report is fundamentally flawed and, [so] too, is the New Paradigm report that relied almost exclusively on Dr. Goldsmith's evaluation." Dkt. No. 41 at 17. The Government reiterates Dr. Goldsmith's opinion that Defendant "does not appear to be sexually aroused by prepubescent or postpubescent children," Dkt. No. 38-5 at 3, and notes that Defendant repeatedly referenced being aroused during his online communications with the undercover agent about the fictitious 10-year-old girl. *See* Dkt. No. 41 at 18. Likewise, Dr. Goldsmith opined that Defendant "does not receive pleasure from sadistic sexual acts." Dkt. No. 38-5 at 8. However, during the detention hearing before Magistrate Judge Stewart, Dr. Goldsmith agreed with the Government that the following were sadistic sexual acts, which Defendant expressed an interest in during his conversations with the undercover agent: ejaculating on a

child's face, inserting a miniature baseball bat into a child's vagina, inserting a butt plug into a child's anus, urinating on a child, and making a child drink urine. *See* Dkt. No. 37 at 57-59. Dr. Goldsmith also testified that Defendant did not "put himself historically in situations where he was around children," Dkt. No. 37 at 27, despite Defendant volunteering with youth hockey teams. The Court agrees with the Government that Dr. Goldsmith's opinion is called into question by these contradictions.

However, perhaps more concerning to the Court is that Dr. Goldsmith testified that he did not view the video, audio clip, or images that were exchanged between Defendant and the undercover law enforcement agent. *See* Dkt. No. 37 at 40-41. Dr. Goldsmith also did not perform objective assessments of Defendant regarding his sexual interests or risk of reoffending. *See id.* at 42-45. Rather, Dr. Goldsmith only spoke to Defendant and reviewed the online messages. *See* Dkt. No. 38-5 at 3. This causes the Court to question the credibility of Dr. Goldsmith's opinion. New Paradigm relied largely on that opinion. *See* Dkt. No. 38-2. It is true that New Paradigm conducted two objective risk assessments, *see id.*, however, New Paradigm noted that it did not conduct a "direct clinical interview" "and original interview notes and raw data from prior evaluations were not available for review. As such, the current findings and STABLE-2007 ratings should be considered provisional and subject to revision." Id. at 15. The report noted that "[a]dditional information, including direct clinical interview, collateral contacts, and more comprehensive background materials, may result in modification of the above conclusions and scores." *Id.* Based on the foregoing, the Court does not find the psychological assessments sufficient to warrant Defendant's release.

This is in part, because much like Magistrate Judge Stewart, this Court has sincere concerns about Defendant discussing his own minor family members in his communication with the undercover agent. *See* Dkt. No. 32 at 11-12. Specifically, Defendant messaged the undercover law enforcement agent that younger family members of his were "growing up and boy are they looking cute." Dkt. No. 42 at 34. He said he would "love to share their pics with" the agent. *Id.* Defendant stated he "only ha[s] G rated [pictures of his family members] haha sadly haven't see them in anything but that." *Id.* at 35. Days later, Defendant asked the undercover agent if one of his family members was "too little for" the agent "to do a tribute." *Id.* at 139. The agent said he would rather discuss his own fictitious daughter and Defendant responded, "just wodn [sic] if you'd be open to it or if she's too little. She's gonna be 6. I also have other relatives too that are closer to" the fictitious child's age. *Id.* at 140.

These comments, combined with the mandatory minimum sentence, and the questionable credibility underlying the psychological assessments lead the Court to conclude that Defendant would pose a danger to the community if released. The Court also agrees with Magistrate Judge Stewart that there are no conditions which could ensure Defendant's safety in the community.

### 5. Insufficiency of Conditions of Release

The Court finds that there are conditions that could be put in place to ensure Defendant's return to Court. For example, Defendant's family and friends have agreed to post a significant monetary bond in the amount of $1,000,000. *See* Dkt. No. 20. Defendant has significant family ties in New York and conditions such as the monetary bond, home detention, and a requirement that he surrender his passport support a conclusion that he is unlikely to flee.

The Court comes to a different conclusion as to his risk of danger to the community. Defendant argues that the proposed conditions are sufficient to mitigate any risk of dangerousness. Specifically, Defendant contends the conditions requiring family members to be present in Defendant's residence 24-hours a day combined with giving Probation access to Defendant's security cameras for inspection would ensure that he does not have access to anyone under the age of eighteen and does not flee. *See* Dkt. No. 38 at 13. Defendant also argues that "there is no basis to believe that [Defendant] would be able to get away with [the underlying behavior again] under the current circumstances." *Id.* Defendant states that his employment as a police officer and the fact that he happened to wipe his phone before reporting to his supervisor do not negate the ability for the proposed conditions to mitigate any risk to the community. *See id.* at 14-15.

The Government proffers that the Probation Department does not find Defendant's proposed condition to be reasonable because it cannot monitor Defendant's home on a full-time basis nor can it monitor what devices other people bring into Defendant's home. *See* Dkt. No. 41 at 24-25. The Government also contends Defendant has shown an ability to hide his online activities and the proposed conditions could not guarantee against it happening again. *See id.* at 25.

The Court agrees with Magistrate Judge Stewart and the Government. Defendant engaged in the conversations with the undercover law enforcement agent between October 2025 and January 2026 and did so undetected by anyone around him. *See* Dkt. No. 1. He discussed using encrypted applications, VPNs, not saving things on his phone, and a burner phone. *See* Dkt. No.

24

42.  Defendant also wiped his phone clean before he was arrested. *See* Dkt. No. 41 at 10.  To be sure, there is no proof at this stage that anyone informed Defendant of his impending arrest or federal charge.  However, his phone was not wiped, his law enforcement supervisor called him, and then Defendant's phone was wiped.  That order of events is concerning to the Court.

Therefore, the Court finds that no conditions or set of conditions would ensure Defendant's safety in the community. *See United States v. Valerio*, 9 F. Supp. 3d 283, 294-95 (E.D.N.Y. 2014) ("[T]he Court finds these conditions are difficult, if not impossible, to enforce, and otherwise insufficient to assure the safety of the community.  Even with the presence of a guard inside the home at all times and the taking of steps to prevent electronic devices from being in the house, there is no way to ensure the full monitoring of defendant's activities.  Computers, mobile phones, tablets, etc.—the type of instrumentalities allegedly used to commit the crimes— are ubiquitous and easy to procure or hide, and increasingly even the lowest-level devices have internet functionality"); *Zhang*, 55 F.4th at 151 (denying motion for bail where the district court found that "[a]lthough the proposed bond package was $5 million . . . .  This package held insufficient 'moral suasion' over [the defendant], particularly considering his 'substantial incentive and ability to flee a potential life sentence.' . . .  The district court also found the other proposed conditions insufficient to prevent flight and protect witnesses and the community.  In the context of this case, [the defendant]'s agreement to waive extradition, proposed monitoring of his cellphone, and proposed electronic monitoring and home detention were also insufficient to allay the risks"); *United States v. Chrestman*, 525 F. Supp. 3d 14, 36 (D.D.C. 2021) (detaining defendant despite suggestion of home detention because "all of the pre-planning, coordination,

25

and obstructive conduct alleged by the government took place while defendant was at his home. He was at his home when he made arrangements to travel to D.C. . . .  He was at his home when he obtained the tactical gear and weapons seen in photo and video evidence, and he was at his home when those same items vanished after January 6").

Based on the foregoing application of the 18 U.S.C. § 3142(g) factors, the Court denies Defendant's appeal and affirms Magistrate Judge Stewart's detention decision.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that the Defendant's appeal (Dkt. No. 38) is **DENIED**; and the Court further

**ORDERS** that the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  June 29, 2026
       Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge

26